Carroll James **FANGUY**

v.

**UNITED STATES of America.**

Civ. A. No. 82–3723.

United States District Court,
E.D. Louisiana.

Aug. 30, 1984.

---

Ronald L. Menville, H. Neil Young, Houma, La., for plaintiff, Carroll James Fanguy.

John Volz, U.S. Atty., W. Glenn Burns, S. Mark Gallinghouse, Asst. U.S. Attys., New Orleans, La., for defendant U.S.

## OPINION

CASSIBRY, Senior District Judge.

Plaintiff Carroll James Fanguy brought this medical malpractice action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq. Fanguy alleges that he lost both his legs to amputation as a result of the refusal of the Veterans Administration ("VA") Hospital in New Orleans to admit him for treatment on November 2, 1980. Trial of this matter was held before the court, sitting without a jury, on March 22, 1984. Post-trial briefing was completed on July 16, 1984. The court now enters its findings of fact and conclusions of law in support of its judgment.

## FINDINGS OF FACT

1. Carroll James Fanguy is a career military man who retired from the service at the end of 1971 with service-connected disabilities.

2. Fanguy presents a medical history replete with vascular circulatory disorders. He first developed circulatory difficulties approximately five years prior to the time when the events in question in this case took place. More severe problems manifested themselves roughly eighteen months prior to the amputation of this right leg in November 1980.

3. On June 15, 1979, Fanguy underwent the first of three arterial bypasses and

grafts to restore circulation to his right leg. An arterial graft and bypass operation is a surgical procedure performed to improve or restore circulation to a part of the body, in this case, Fanguy's right foot. The occluded, or blocked, portion of the blood vessel is removed and replaced by synthetic vessels. If unrelieved, the consequences of vessel occlusion can be severe. The occlusion deprives the affected area of blood supply and the oxygen necessary to sustain cell life. The anoxic region will become aschemic (discolored), painful and cold. Only if blood circulation is restored promptly can cell damage be reversed.

Time is, therefore, of the essence in such cases. The time for restoration of circulation is measured in hours and days. Within a matter of three or four days, anoxia may be so severe that cell damage is likely to be irreversible even if the blockage to circulation is eliminated. Once cell damage has reached this stage, the threat of infectious gangrene mandates amputation of all or part of the affected limb.

4. Fanguy underwent two subsequent arterial graft and bypass operations in November of 1979 and June of 1980. All three bypass procedures were performed within three days of the onset of symptoms associated with vessel occlusion (severe pain, discoloration, and weak pulses).

5. On Saturday, November 1, 1980, Fanguy contacted his personal physician, Dr. Jerry Levine, and complained of a resumption of pain and other symptoms of impaired circulation in his right foot. Dr. Levine examined Fanguy that morning and found his foot to be cold and aschemic. Dr. Levine, a general practitioner who had treated Fanguy for the past nine years, but who had no specialized training in vascular medicine, recommended that Fanguy proceed to New Orleans at once for consultation with his private vascular surgeon.

6. Fanguy thereupon travelled from his home in Chauvin, Louisiana to New Orleans, a journey of less than two hours. In New Orleans, he presented himself to Dr. Rudolph Weichert in the early afternoon. Dr. Weichert was a member of the group of vascular surgeons who had preformed Fanguy's previous arterial bypass operations and was personally familiar with Fanguy's medical history.

7. Dr. Weichert's examination of Fanguy revealed undiminished pain and lost pulses in the right foot. After the examination, Dr. Weichert recommended that Fanguy be admitted to the hospital that afternoon. It was Dr. Weichert's intention to admit Fanguy to Touro Hospital, a private institution in New Orleans.

8. Fanguy, however, demurred and stated his preference for the VA. Fanguy explained that he had exhausted his financial resources in paying for his prior medical treatment and that he wished to determine if he would be eligible for admission to the VA. Dr. Weichert agreed to allow Fanguy to explore this possibility and, as an alternative, scheduled Fanguy to be admitted to Touro for the following Monday. Dr. Weichert also gave Fanguy a prescription for Percodan, a pain-killing drug.

9. Fanguy determined not to seek admission to the VA that Saturday. Instead, he repaired to his sister-in-law's home to rest. Rest, however, proved impossible to achieve on account of the intractable pain in his right foot. Despite consuming Percodan at four times the prescribed rate, Fanguy was unable to alleviate the pain.

10. Early Sunday morning, Fanguy's wife contacted the VA and made arrangements to bring her husband in at once. The couple went together to the New Orleans VA Hospital and presented themselves at the emergency room.

After a lengthy wait, Fanguy was seen by Dr. Cynthia Coe of the VA staff. Fanguy complained of pain so "hard" he had been unable to sleep. At this time, Fanguy's foot was cold and aschemic and he continued to be in great pain despite the pain medication. Dr. Coe removed Fanguy's shoe and sock to reveal a discolored, bluish foot. She asked Fanguy to walk, but conducted no further examination.

11. This was not Fanguy's first visit to the VA for his circulatory problems. He

had been seen twice before in the month of October at the Vascular Clinic and had another appointment with the Neurosurgery Clinic scheduled for November 5th, the following Wednesday.

12. Dr. Coe neither consulted Fanguy's hospital records nor did she take a proper history of his circulatory problems. She ignored his complaints of great pain and chose instead to write a prescription for sleeping pills. Despite Fanguy's statement that he had seen a vascular surgeon on the previous day, Dr. Coe did not refer Fanguy to a vascular surgeon at the VA. Instead of admitting him or referring him to a vascular specialist for further consultation, Dr. Coe discharged Fanguy with instructions to return on Wednesday to keep his scheduled appointment with the Neurosurgery Clinic. Unable to obtain admission to the VA, and distraught over Dr. Coe's remark that "All you're looking for is dope," Fanguy returned to his sister-in-law's home for another insufferably long day and night.

13. Pain is the most telling and reliable indicator of the condition of a patient with Fanguy's symptoms. When Dr. Weichert examined Fanguy on Saturday, Fanguy had just begun to suffer from rest pain and his pain had not yet had an opportunity to respond to the prescribed medication. By the time Fanguy was seen at the VA on Sunday, his condition had undergone at least one critical change, namely, the failure of the pain medication to have an effect. Fanguy was then suffering from continuous, severe pain despite the heavy dosages of potent pain reliever he had been taking.

Dr. Coe ignored this and other indications of the seriousness of Fanguy's condition. The testimony of defendant's own medical experts confirm that, under the circumstances, Dr. Coe's refusal to refer Fanguy to a vascular surgeon or to admit him to the VA for treatment was conduct falling below the standard of proper medical practice for emergency room physicians.

14. The next day, Monday, November 3, 1980, Fanguy went to Touro Hospital and was admitted there. He was attended at Touro by his vascular surgeon, Dr. Weichert. On Tuesday, November 4th, Dr. Weichert performed an arteriogram which revealed all major femoral vessels to be occluded. No sites for a possible bypass were found. Dr. Weichert next attempted a popliteal exploration of the foot and leg in an effort to salvage Fanguy's leg. The exploration revealed chronic obliteration of the blood vessels by the process of arteriosclerosis. Again, no possible bypass sites were discovered.

15. Finally, with all hope for a successful bypass gone, on Friday, November 7, 1980, Fanguy's right leg was amputated above the knee. This was to be the first in a series of five amputations. Complications from the initial surgery continued to plague Fanguy and made it necessary for him to submit to subsequent operations which cost him the remainder of his right leg.

16. Within a short time after his initial amputation, Fanguy began to develop circulatory difficulties in his left leg. Ultimately, this leg was also amputated at the hip, leaving Fanguy confined to a wheelchair. The failure to admit Fanguy to the VA for treatment of the circulatory problems in his right foot did not, however, contribute to the loss of his left leg.

17. It was negligence to deny Fanguy a referral to a vascular surgeon or admittance to the VA on Sunday. The question remains, however, whether Fanguy's amputation would not otherwise have taken place. The medical testimony adduced at trial is unanimous on one point at least. No matter what, Fanguy's circulatory problems were so severe that he would have lost his right leg within a year of November 1980, even if a fourth arterial bypass had been successfully performed. Thus, any negligence on the part of the VA cost Fanguy the use of his leg for, at most, one year.

18. The refusal of the VA to treat or admit Fanguy on Sunday did not, however,

cost him his leg. This fact is established by the course of treatment followed at Touro once Fanguy did gain admittance. He was not rushed immediately upon admittance to the operating room. Instead, Fanguy was treated on an nonemergent basis, undergoing a series of procedures over the course of several days. Only when all of these tests proved that no procedure or operation would be likely to restore circulation to Fanguy's foot did the medical team surrender to the inevitable.

19. Although time is of the essence in treating a circulatory obstruction of this nature, there is a complete lack of evidence upon which the court might base a conclusion that a delay of one day in admitting plaintiff to the hospital made it less likely that a bypass site would be found. There is simply no indication in the record that the anoxia due to the interruption of blood supply to plaintiff's right foot also diminished the likelihood that a site for a bypass could be discovered. The rapidity with which cell death occurs in areas deprived of blood flow has not been related to the preservation of sites for bypass and graft surgery to restore circulation. There is no indication that such an operation could have been successfully performed had a proper course of treatment commenced on Sunday rather than Monday. The plaintiff has, therefore, failed to establish that the negligent conduct of the VA in any way caused him to lose his leg.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* and 28 U.S.C. § 1346(b).

■ 2. Under the FTCA, the liability of the United States is to be adjudicated in accordance with the substantive law of the state where the act of negligence occurred. 28 U.S.C. § 2672. *See, e.g., Arrendale v. U.S.,* 469 F.Supp. 883 (N.D.Tex.1979); *Johnson v. U.S.,* 271 F.Supp. 205 (W.D. Ark.1967).

3. Louisiana Revised Statute 9:2794 governs medical malpractice actions in this state. The statute places the burden on the plaintiff to prove:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

4. The United States contends that plaintiff's failure to identify Dr. Coe's medical specialty makes it impossible for plaintiff to satisfy the first prong of his burden of proof under the statute. Although Dr. Coe's particular medical specialty was not known, plaintiff did establish that Dr. Coe was a staff physician in the emergency room of the New Orleans VA Hospital. Thus, Dr. Coe's conduct is to be considered in view of the degree of care ordinarily practiced by physicians engaged in emergency medicine.

■ 5. In coming to a conclusion regarding the customary standard of care, the court is to rely on the testimony of qualified medical experts. *Steinbach v. Barfield,* 428 So.2d 915, 919 (La.App.1983). The testimony of both Dr. Levine, a general practitioner, and Dr. Weichert, a cardiovascular surgeon, established that an emergency room physician confronted with a patient exhibiting those symptoms Fanguy

presented on Sunday morning would be expected to either consult with a vascular surgeon or admit the patient to the hospital for treatment.

■ 6. Dr. Coe failed to meet this standard of care. She conducted a brief and cursory examination of Fanguy and ignored his symptoms of circulatory insufficiency. For Dr. Coe to prescribe sleeping pills and direct a patient in Fanguy's condition to return in four days is conduct falling below the standard of care owed by an emergency room physician. Thus, Fanguy has satisfied the first two prongs of the statutory test.

■ 7. Fanguy has not, however, been able to demonstrate, as required by the statute, that the VA's negligence was a proximate cause of his injuries. At trial, Fanguy relied on Dr. Levine for expert medical testimony. Dr. Levine, however, testified only as an expert in the general practice of medicine. When questioned about the short-term consequences of the failure to admit Fanguy to the VA on Sunday, Dr. Levine gave no answer since the question took him past the limits of his expertise. Instead, he stated that he would leave the question to be answered by a vascular surgeon. Neither of defendant's medical experts, both vascular surgeons, were prepared to say that the course of events was affected by the VA's failure to admit Fanguy on Sunday. In their view, the progression of Fanguy's peripheral vascular disease had already passed the stage where his leg could be salvaged by bypass surgery. The record, therefore, simply leaves the court unable to conclude that the negligence of the VA was a proximate cause of the plaintiff's injuries. The third prong of the statutory test for medical malpractice has not, therefore, been satisfied and there can be no recovery for plaintiff.[1]

Accordingly, plaintiff's claim against defendant is DISMISSED with judgment to be entered accordingly.

---

1. We note that Fanguy has also advanced a claim for damages for the mental anguish he suffered as a result of the VA's negligence. In the absence of a finding that the VA's negligence was a proximate cause of the amputation of plaintiff's leg, the evidence must establish the requisite intent on the part of the defendant to injure the plaintiff in order for Fanguy to recover. *See, e.g., Ferlito v. Cecola,* 419 So.2d 102 (La.App.1982). Fanguy has established no such intent and, therefore, is not entitled to recover on this ground.