**Carl SEWELL and Mary Sewell**

v.

**UNITED STATES of America.**

**Civ. A. No. 84–0458.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Feb. 24, 1986.

Edmund M. Thomas, Shreveport, La., John T. Burroughs, Salem, Wis., for plaintiffs.

Joseph S. Cage, U.S. Atty., and J.R. (Jack) Halliburton, Asst. U.S. Atty., Office of the U.S. Atty., Dept. of Justice, Shreveport, La., for defendant.

STAGG, Chief Judge.

## OPINION

## I  INTRODUCTION

Plaintiff Carl Sewell and his wife, who joins his petition for damages, have filed suit alleging medical malpractice on the part of plaintiff's treating physicians at the Veterans Administration Medical Center ("VA") in Shreveport, Louisiana. Plaintiff sues under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680. Thus, jurisdiction is proper in this court. 28 U.S.C. § 1346(b).

■  Under the FTCA, the "United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. The appropriate law to follow in determining liability under the FTCA is the law of Louisiana, where the negligent act is alleged to have occurred. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *see also* 28 U.S.C. § 1346(b) ("in accordance with the law of the place where the act or omission occurred"). The controlling Louisiana provisions are La.R.S. 9:2794 which governs medical malpractice actions and Civil Code article 2315 which governs negligence actions in general.

The plaintiff alleges that the VA was negligent in failing to diagnose and treat his condition properly. Plaintiff was treated by specialists in the field of internal medicine while at the VA. He alleges that they should have discovered and treated an infection of his spine, known in medical practice as osteomyelitis, which is an infection of bone by microorganisms which can result in destruction of the bone. Plaintiff alleges that the VA's failure to diagnose osteomyelitis resulted in the development of an epidural abscess and eventual paraplegia.

Under Louisiana law, the plaintiff in a medical malpractice action has a three-part burden of proof. First, in a case such as this brought against specialists, "the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty." La.R.S. 9:2794(A)(1). Second, the plaintiff must prove that "the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill...." La.R.S. 9:2794(A)(2). Third, the plaintiff must prove that he suffered injuries" as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care...." La.R.S. 9:2794(A)(3).

After a review of the three days of testimony in this matter as well as an exhaustive review of the depositions and other documentary evidence submitted, this court concludes that the physicians of the VA failed to exercise the required degree of skill in their treatment of Mr. Sewell and that this failure was the proximate cause of damage to plaintiff. Consequently, the United States is liable to plaintiff just as a private individual would be liable under the same circumstances.

## II MEDICAL HISTORY

Carl Sewell was admitted to the Wadley Hospital in Texarkana, Texas, on May 7, 1981. At the time of this admission he was a regularly employed truck driver engaged in the long distance hauling of new automobiles and had been so employed for 40 years. A recent history of pain between the right scapula and the spine prompted this admission. The admitting history revealed that plaintiff had a history of adult onset diabetes (controlled by oral medication), chronic kidney stones with episodes of urinary tract infections, obesity, elevated uric acid levels (treated with oral medication), chronic degenerative arthritis of the lumbar spine, fever with no localizing symptoms, and an unrelated skin lesion on his upper right arm. On the date of admission, plaintiff's temperature elevated to 101.2 F. Due to the temperature elevation, two blood cultures were taken. The cultures were positive for *staphylococcus aureus* (a bacteria) which proved sensitive to cephalosporin drugs. From May 7 to May 10, plaintiff received Keflex (an antibiotic) orally. From May 10 to May 14, plaintiff received Kefzol (another antibiotic) intravenously. From May 15 to May 18, Ancef (yet another antibiotic) was given intramuscularly. Finally, from May 18 to May 24, plaintiff was given Keflex orally. After discharge on May 24, no further antibiotic therapy was administered.

It was determined that Mr. Sewell had a blood stream infection, at times referred to as "bacteremia" and at other times labeled "septicemia." This condition was described in its simplest terms as blood poisoning. "It means that bacteria are living and are present and can be proven to be present inside the bloodstream." (Deposition of Dr. West at 19.) Some bacteremias are "clearly a complication of a localized infection and other bacteremic infections are not associated with a specific site of infection." (*Id.* at 20.) In plaintiff's case, the invading bacteria was *staphylococcus aureus* which was described as "a gram positive coccal bacteria, which is ubiquitous, has a special propensity for invading deep tissues forming deep abscesses. That is such as abscesses in the kidney or bone, and also has a special propensity for producing infection on the heart valves called endocarditis. Of the organisms [seen] in common medical practice, *Staph. aureus* is probably singularly the most invasive of the standard organisms...." (Deposition of Dr. King at 8.) Although a bone scan and an echocardiogram were performed, no deep-seated site of infection was found in plaintiff. The bone scan was interpreted as being negative by the doctors at Wadley Hospital.

Plaintiff was discharged from Wadley Hospital on May 24, 1981, with a discharge diagnosis of degenerative neck, thoracic and shoulder disease, obesity, adult onset diabetes, septicemia with *staphylococcus aureus*, and yeast infection of the urinary tract. This admission to the Wadley Hospital will be referred to as "Wadley I."

A continuation of the shoulder-back pain prompted plaintiff to seek treatment at the VA Medical Center in Shreveport on June 9, 1981, 16 days after the Wadley I discharge. Plaintiff remained at the VA until June 22, 1981. This admission to the VA will be referred to as "VA." The admitting history taken by the VA was as follows: three month history of shoulder and back pain, recent hospitalization at the Wadley Hospital in Texarkana, a one month history of low grade fever documented to be as high as 103° at Wadley, positive blood culture for *staphylococcus* at Wadley, history of intravenous and oral antibiotics for seven to eight days during prior admission, obesity, history of kidney stones and urinary tract infections. The initial plan of treatment included: thoracic spine x-rays, a bone scan, tuberculin skin test, blood cultures if temperature rose above 101°, weight reduction diet, chest films, and a myelogram if the patient developed a neurological deficit. Upon admission, plaintiff was assigned to Team V, a service under the direction of Dr. Joyce Redetzki.

On June 12, when Sewell became upset at the level of care being accorded him, and against doctor's orders, he was given two

doses of Bactrim, an antibiotic administered for plaintiff's urinary tract infection. On June 13, a blood culture was drawn. This culture was negative. On June 15, Dr. Redetzki ordered that plaintiff's records and x-rays be obtained from Wadley Hospital. This request was received by Wadley on June 18. The records arrived at the VA on June 25, shortly *after* plaintiff's discharge. These records were never reviewed by the VA physicians prior to this lawsuit.

Apart from the blood culture a number of other tests were conducted. A blood work-up revealed an erythrocyte sedimentation rate ("sed rate") of 120 and elevated immunoglobins. The sed rate test was explained by Dr. West:

> The erythrocyte sedimentation rate is a relatively easy test to run, inexpensive and uncomplicated. It consists of taking anticoagulated blood, putting it in a tube and allowing it to sit on a desk top for one hour. During that time the red blood cells which are evenly distributed at the beginning, sediment toward the bottom of the tube. The rate at which the interphase between the red blood cells and the clear plasma falls to the bottom is called the sedimentation rate, and since it is only read one time at the end of one hour, basically if one has 100 millimeter tube or say a 200 millimeter tube, whatever the size of the tube, one can actually measure at the end of one hour the number of millimeters that this interphase has fallen, and then we call that the erythrocyte sedimentation per hour. It is expressed in millimeters per hour.... [N]ormally men would have, depending on the method used, would have levels or values that would be either zero to ten or zero to twenty, and I am not certain which was the case here. It is not relevant since the level was so high in this patient at this time. It was 120 millimeters per hour which is not a specific test, but it is highly consistent with a significant infection or inflammatory condition.

(Deposition of Dr. West at 22–23.) The elevated immunoglobins represent an increase in the fraction of the blood which contains antibodies, or proteins used to destroy infection causing organisms. An echocardiogram was performed on plaintiff which was normal. The spine x-rays taken of plaintiff showed syndesmophytes (defined in the parties' glossary of terms as an abnormal bony outgrowth from a ligament) in the lower thoracic and lumbar spine areas. Additionally, the bone scan taken at the VA was positive in the upper thoracic area. After the positive bone scan was obtained, plaintiff was transferred to Team 6E, a service under the direction of Dr. Ruth.

Dr. Frank Dunphy, a resident on Team 6E, reviewed the patient's history and conducted a physical exam of plaintiff upon his transfer. Dr. Dunphy's transfer note contains a differential diagnosis, or a list of potential causes, for plaintiff's back pain. This differential diagnosis indicates that Dr. Dunphy considered the following as a potential etiology for the back pain:

1. Syndesmophytes impinging on foramen (extraneous calcium narrowing of the openings through which the spinal nerves exit from the spinal cord); *versus*
2. Multiple myeloma (a malignant disease of the bone marrow) *versus*
3. Disc disease (degeneration of the intervertebral discs); *versus*
4. Pott's Disease (a bone infection caused by tuberculosis); *versus*
5. Metastatic cancer (cancer which is spread from a primary site to other organs); *versus*
6. Trauma; *versus*
7. Osteomyelitis (an infection of the bone by bacteria or other microorganisms with resulting bone destruction); *versus*
8. Rheumatic disease (nonspecific inflammation of the bone).

Dr. Dumphy also included in his transfer note the following findings: a fever of unknown origin (with a possible etiology of occult tumor, osteomyelitis, tuberculosis, or fungal disease), increased alkaline phosphatase (an increase in an enzyme found in bone and other organs), a pleural effusion

(or fluid in the chest with a possible etiology of tuberculosis, malignancy or fungal disease), leukocytosis (or elevated white blood count), anemia, proteinuria (or protein in the urine), and a lesion in the thoracic spine on the bone scan.

At this point, it becomes unclear exactly what process was used to arrive at a final diagnosis of plaintiff's back pain. A rheumatology consultation was obtained on June 22, 1981. This consult concluded in a diagnosis of anykylosing hyperostosis (a disease in which bridging calcifications occur between vertebral bodies). However, the rheumatology note indicated that ankylosing hyperostosis was *not* the etiology of plaintiff's pain. In any event, after a notation that plaintiff had a complete or full night of sleep during which he required no pain medication on June 21, plaintiff was discharged on the 22nd, the same day as the rheumatology consult.

The discharge diagnoses were ankylosing hyperostosis, adult onset diabetes, kidney stones, anemia of unknown origin, gout, obesity, and urinary tract infection. Plaintiff was told that he had a problem of arthritis and anemia and that he should follow up on the anemia with his family doctor. The patient was discharged with a variety of medications to continue taking.

Plaintiff returned to the VA 17 days later, on July 9, 1981 again complaining of back pain. He was seen by Dr. John Smith who at that time was a first-year resident in psychiatry in his first week of duty at the hospital. Dr. Smith read the discharge summary from the VA admission; however, he did not review the Wadley I records which were at the VA at this time. Dr. Smith did not have plaintiff undress, nor did he conduct a physical exam. The plaintiff's wife testified that had plaintiff undressed, a red lump the size of a goose egg would have been apparent on his right upper back. She stated that this lump would blanch when touched. Dr. Smith increased the dosage of one of plaintiff's medications and gave him a shot of Celestone IM (2 cc.). Several witnesses seeking to present a favorable view of this occasion

made references to the fact that he walked into the VA and he walked out.

One week later, on the night of July 15 or early morning of July 16, after watching television, he rose from his chair to go to bed and his legs buckled beneath him. He was readmitted to Wadley Hospital in the early morning of July 16. This admission will be referred to as Wadley II.

Upon readmission to Wadley Hospital, plaintiff complained of weakness in his legs and could not walk without assistance. Plaintiff was examined and found to have a positive Babinski reflex. A positive Babinski indicates that there is an injury to or impingment on the spinal cord. A bone scan was taken and was found to be positive. Tomograms (thin "cuts" of x-ray studies which show greater detail of the bones) revealed the presence of destructive disease with a narrowing of the disc space in the thoracic spine. A paraspinous (adjacent to the spine) mass was seen in these tomograms. A neurosurgeon examined Sewell on July 17; on July 18 a myelogram (test in which x-ray sensitive material is injected into the spinal fluid) was performed and demonstrated a complete block at T5. On July 20 a hemilaminectomy was performed. During surgery an epidural abscess was found. A culture revealed *staphylococcus aureus* with the same sensitivities as had been found in May. Antibiotic treatment was begun.

Postoperatively, plaintiff at first appeared to improve. However, by July 29, 1981, there was concern over recurrent weakness in his legs. Prior to the 29th, it appears that Sewell may have been requested to sit up and dangle his legs. By July 31, complete paralysis of his lower body was noted.

The subsequent course of Sewell's medical history includes a repeat laminectomy and transversectomy at St. Luke's Hospital at Houston, Texas. Plaintiff stayed at St. Luke's from August 26 until October 9, 1981. He was placed on a Stryker frame for about a month following his operation at St. Luke's. From St. Luke's, he was then admitted to the Physicians and Sur-

geons Hospital at Shreveport, Louisiana, where he remained from October 9, 1981 until August 12, 1982. At P & S, he underwent extensive physical therapy—eventually regaining partial use of his lower extremities—and a grueling round of antibiotic treatment for the continuing *staph* infection. Since that time, Sewell has undergone a series of hospitalizations and operations directly linked to his partial paraletic condition.

## III ALLEGED ACTS OF MALPRACTICE

Plaintiff's central complaint is that the VA failed to diagnose osteomyelitis and to timely treat that condition resulting in neurological deficit and paraplegia. He does not point to a single act of negligence at the VA, but rather points to the whole picture of his treatment there. As a consequence, many issues are raised and fingers are pointed in many directions. From a legal point of view, this presents difficulties in that some of these issues fall under the general body of malpractice case law requiring the doctor to exercise "ordinary skill," while other issues are governed by a special body of case law.

A misdiagnosis case is admittedly one of the most difficult malpractice actions to litigate. Due to the sheer number of medical issues in this case, findings of fact could proliferate and obscure critical points. For example, one could debate all month the issue of whether Sewell had a fever while at the VA without coming a step closer to determining whether there was any malpractice.

In order to steer a clear course through the myriad issues raised in this suit, it is helpful to keep in mind two questions: (1) should the VA, in exercising the degree of care ordinarily practiced by specialists in the field of internal medicine, have diagnosed plaintiff as having osteomyelitis; and (2) if so, was injury to plaintiff a proximate result of the failure to exercise this degree of care. These questions obviously incorporate the requirements of Louisiana's statutory medical malpractice scheme. La.R.S. 9:2794. It is plaintiff's burden to prove by a preponderance of the evidence that the answer to both questions is "yes." R.S. 9:2794(C).

In determining whether the plaintiff has met his burden of proof, the court relies on the testimony and opinion of medical experts. *Fanguy v. United States,* 595 F.Supp. 456, 460 (E.D.La.1984); *Steinbach v. Barfield,* 428 So.2d 915, 919 (La.App. 1st Cir.1983). This expert testimony must be tempered by the knowledge that Louisiana law does not hold the physician to a standard of perfection. A treating physician—whether a general practitioner or specialist—is only liable if his actions fall below the standard of care ordinarily exercised under similar circumstances by members of his profession. *Meyer v. St. Paul Fire & Marine Insurance Co.,* 73 So.2d 781 (La. 1954). The standard for a medical specialist is "to exercise the degree of knowledge or skill ordinarily exercised and possessed by physicians in his medical specialty. *Babin v. St. Paul Fire & Marine Insurance Co.,* 385 So.2d 849 (La.App. 1st Cir.1980)". It must also be remembered that under Louisiana law, "injury alone does not raise a presumption of the physician's ... negligence." La.R.S. 9:2794(C).

Plaintiff points to many acts of negligence on the part of the VA, including the method and timing of taking plaintiff's blood culture, the failure to follow up Dr. Dunphy's differential diagnosis, the misdiagnosis of his disease, the failure to obtain and to follow up on the Wadley I records, and the failure to treat him properly during his emergency room visit on July 9, 1981. Each of these contentions will be considered.

A Blood Cultures:

Plaintiff contends that the government is liable to him, in part, because of the manner in which it obtained certain blood cultures. Upon plaintiff's admission to the VA, the initial plan of treatment included taking blood cultures if Sewell's temperature rose above 101° F. It must be remembered that at this point plaintiff had

a number of other ailments besides his back pain, including a urinary tract infection. Bactrim, an antibiotic used to combat such infections, was given to the plaintiff on June 12, 1981. The next day blood cultures, one aerobic and one anaerobic, were taken. It was conceded by Dr. Redetzki that the administration of Bactrim on June 12 was against orders. The plaintiff contends that this method and timing of blood culture studies constitutes malpractice because the antibiotic Bactrim was administered prior to the taking of cultures and because a *series* of cultures to be drawn at set intervals was not ordered.

The expert testimony reveals that there was a distinct *possibility* that Bactrim, a drug which, according to the *Physician's Desk Reference*, may be detectable in the blood 24 hours after administration, could have rendered the blood cultures negative. Sewell had recorded staphylococcal infections both prior to and after his stay at the VA. A consensus of the experts who testified agreed that plaintiff had an ongoing infectious process while at the VA. This infection was located in his spine and is known medically as osteomyelitis. Bactrim has antistaphylococcal properties, although Dr. West was of the opinion that this might not have been general knowledge in 1981. (Deposition at 17.) In any event, the expert consensus appears to be that it is better to take cultures prior to the administration of any antibiotics.

There was conflicting evidence concerning the number of cultures which the ordinary standard of care requires to be taken. Plaintiff contends that the ordinary standard of care requires that a series of cultures be taken. The evidence on this point reveals that a number of standards have been found acceptable by the medical community over time. Additionally, two doctors whose specialties require special knowledge of osteomyelitis (Dr. West—an internist with a subspeciality in infectious diseases, and Dr. Smith—a neurosurgeon) testified that this disease produces only intermittent bacteremia and not a constant blood stream infection which might be consistently detected in blood culture studies.

Accordingly, this court cannot conclude that there is a medical *probability* that the administration of Bactrim resulted in a negative culture thus precluding proper diagnosis of Sewell's condition. The intermittent nature of the bacteremia produced by osteomyelitis precludes a finding of malpractice in the taking of the blood cultures at the VA. The plaintiff has not proven by a preponderance of the evidence a causal link between the negative culture and plaintiff's ultimate paralysis. *See Fanguy*, 595 F.Supp. at 461.

B  Differential Diagnosis:

After the positive bone scan, Sewell was transferred to a new team, team 6E. Based on the positive bone scan and other available information, Dr. Dunphy, a resident on that team, established a differential diagnosis for plaintiff's back pain. (Plaintiffs' Exhibit 2 at 113.) A differential diagnosis is a list of all reasonably plausible diagnoses for a given complaint. The experts who testified concluded that Dr. Dunphy's differential diagnosis was "outstanding" and "very thorough." Plaintiff has no quarrel with this differential diagnosis, but submits that it was improperly followed up. He contends that further testing and consultation was required.

Dr. Dunphy's differential diagnosis included osteomyelitis, the condition which later events proved to be the source of Sewell's back problems. In this case, the osteomyelitis was caused by a *staphylococcus aureus* infection. This bacteria was described by one witness as "an extremely necrotizing, nasty bacteria." (deposition of Dr. West at 91.) Indeed, one of the dangers of osteomyelitis caused by *staph aureus* is that "given time . . . it tends to form abscesses, it forms a lot of pus, the white cells that come to those areas . . . also contribute both the attempt on the part of the body to control infection, but perhaps also contribute to some of the damage that it has caused to the body's own tissue. This process in and about the spine can reasonably be expected to progress to the intramedullary part of the

spinal bones meaning adjacent to and next to and impinging on the spinal cord and other nerves that run inside of the medullary canal, so given time, [and] no diagnosis [of osteomyelitis], an epidural abscess would be expected to occur...." (*Id.* at 91–02.) An epidural abscess "is an abscess that encroaches on the spinal cord by enlarging into the epidural space. It is usually associated with an osteomyelitis of the adjacent vertebral structures." (Deposition of Dr. King at 35.) Every doctor who testified was of the opinion that osteomyelitis was a serious and life-threatening disease, which, if left untreated, would eventually result in death.

The plaintiff established the standard of care expected of treating physicians in formulating a diagnosis with the following litany of questions:

1. Do you agree that medical judgment must be based on sound medical principles?
2. Medical principles require that examination and other diagnostic tests be performed?
3. If a diagnosis can be made, then the patient must be treated?
4. If no diagnosis can be made, then a differential diagnosis must be made which includes a list of all reasonably plausible diagnoses?
5. All life threatening diagnoses must be ruled in or out?
6. Failure to rule these in or out, where it may be reasonably done, poses a foreseeable risk of harm to the patient?
7. All diagnostic tests which pose no threat of harm to a patient must be used?
8. Osteomyelitis should be ruled in or out?

Out of the 15 doctors who testified, seven were asked this litany of questions in its entirety. Each question was answered "yes." Many of those doctors who were not asked the entire list of questions were questioned about the necessity of ruling out all life-threatening illnesses in an differential diagnosis. With one exception, these doctors also responded "yes." As one defense expert put it, the questions raised by plaintiff in this litany constitute "basic rules of medicine." (Depositions of Dr. Benzel at 52.)

Plaintiff contends that the VA breached the required standard of care in not ruling out osteomyelitis from the differential diagnosis formulated by Dr. Dunphy. Specifically, plaintiff argues that the VA should have ordered tomograms (special x-rays which show greater detail than routine films), a CT scan and consultations with specialists in infectious disease and/or neurology.

Following the differential diagnosis, several tests were run by the doctors at the VA. Pott's Disease was ruled out as a cause of the patient's back pain on the basis of a tubereculosis test. A rheumatology consultation was obtained. This consultation confirmed that plaintiff suffered ankylosing hyperostosis, but the rheumatologists cautioned that this was not the source of pain. Dr. Dunphy admitted on cross-examination that after the rheumatology consultation, nothing was done to rule out osteomyelitis. Medical experts conducting an independent review of the records also reached the conclusion that the physicians at the VA did nothing to rule out osteomyelitis.

At least four medical experts (Drs. McRaney, Holton, Gerrol and West) testified that it was below the standard of care ordinarily expected of treating physicians not to take tomograms when osteomyelitis was part of the differential diagnosis. Even defense witnesses (Drs. King and Smith) felt that tomograms were a necessary step in the diagnosis process of plaintiff's illness. Medical opinion was divided concerning CT scans. Given that both plaintiff and defense doctors clearly felt that tomograms were warranted in this case, the issue of whether CT scans should *also* have been taken appears to be moot.

Plaintiff has carried his burden of proof on the issue of causation by evidence that timely diagnosis was possible and would have prevented paralysis. Several experts

testified that tomograms were more sensitive tests and that, more probably than not, would have shown bone destruction during the VA admission. Once bone destruction was confirmed by tomograms, the VA would have had a working diagnosis of osteomyelitis. There was overwhelming evidence that had treatment of osteomyelitis begun at the VA, plaintiff would not have developed the partial paralysis which he now suffers. On this point it is important to note that even defense experts (Drs. Smith, Menoni and Benzel) agreed that had Sewell been treated for osteomyelitis at the VA, there was a "high probability" or "reasonable probability" that he would not have sustained neurological damage.

■ Osteomyelitis is a progressive infectious process, in this case affecting the spine. It is imperative to start treatment as quickly as possible. With osteomyelitis. of the spine, the treatment is necessary to prevent growth of the disease and to stop any subsequent abscesses from spreading to the epidural space surrounding the spinal cord. Once the disease progresses to that point, the spinal cord becomes impaired and the patient suffers visible neurological symptoms such as weakness of the legs, loss of control over bladder and bowel functions, and demonstrable reflex impairment. Collectively these symptoms are called "neurological deficits." Once neurological deficits occur, there is no guarantee that they can be reversed. This is due in part to swelling, the pressure caused by the abscess on the spinal cord, and the fact that infection impairs the spinal cord's function (by blocking veins which supply nutrients to, and take waste products away from, the spinal cord). By failing to provide timely treatment, the VA significantly increased the likelihood of serious, potentially life-threatening injury to plaintiff. This is sufficient to meet the statutory burden of proving that the malpractice is a proximate cause of harm. Under Louisiana law, the plaintiff need only prove that the negligence resulted in diminished statistical expectation of improvement. *Hunter v. Office of Health Services and Environmental Quality*, 385 So.2d 928, 933 (La.App. 2d Cir.1980).

■ Plaintiff also proved by a preponderance of the evidence that it fell below the standard of care not to call in consultations in infectious disease and/or neurology. Louisiana jurisprudence has a special rule for allegations of malpractice for failure to call in consultants: "[I]t must be shown that consultation with a specialist would have resulted in different or additional treatment, or that such treatment would have been more beneficial than what was done." *Villetto v. Weilbaecher*, 377 So.2d 132, 135 (La.App. 4th Cir.1979). It is "not necessary to consult a specialist where the problem is within the sphere of the doctor's own training and expertise." *Id.*

Dr. Saunders testified that it was below the standard of care not to call in an infectious disease or orthopedic consultation. Dr. Graddis explained that there was a significant difference between the examination performed by a neurologist and that done by other types of physicians such as rheumatologists. The testimony of Dr. West indicates that a consultation would have resulted in different treatment or more beneficial care. He stated that it was his opinion that within a reasonable medical probability a specialist in infectious disease would have diagnosed osteomyelitis. (Deposition at 41.) This testimony went uncontradicted. The causation issue is the same here as for the failure to obtain further tests. Due to the progressive nature of osteomyelitis, timely treatment is the key to the management of this disease. Failure to call in experts prevented timely diagnosis. This delay in diagnosis prevented treatment prior to the onset of neurological deficits.

### C MISDIAGNOSIS OF ANKYLOSING HYPEROSTOSIS:

■ After a rheumatology consult, plaintiff was discharged with a diagnosis of ankylosing hyperostosis. This disease was defined as "[a] distinct pathological entity in which bridging calcifications occur be-

tween four contiguous vertebral bodies." (Defendant's Amended Glossary of Terms.) Plaintiff contends that this is a misdiagnosis of his condition and an act of malpractice. A special body of law has developed for alleged acts of misdiagnosis:

> As to the diagnositic duties required of a ... physician, an error of diagnosis is not malpractice per se. A physician ... is not obligated to always be correct in making a diagnosis. A diagnosis is an act of professional judgment and, in case of a misdiagnosis, malpractice exists only if it results from a failure by a physician ... to exercise the standard of degree of care in diagnosing which would have been exercised by a member of his profession in good standing in his locality, under similar circumstances.

*Tillman*, 417 So.2d at 114. *See also Gendusa v. St. Paul Fire & Marine Ins. Co.*, 435 So.2d 479 (La.App. 4th Cir.1983). It must also be remembered that in assessing whether the VA failed to exercise the required degree of skill "must be determined in light of conditions existing and facts known at the time thereof, and not in the light of knowledge gained through subsequent developments." *Tillman*, 417 So.2d at 114 (citing 70 C.J.S. Physicians and Surgeons § 48).

This is the most difficult of all of plaintiff's contentions. Plaintiff's experts, on the whole, concluded that the information at the VA "as a bundle," to use the words of Dr. Gerrol, was inconsistent with a diagnosis of ankylosing hyperostosis. Defense experts (a number of whom were treating physicians) stated that they were satisfied with the diagnosis of ankylosing hyperostosis or looked only at whether an epidural abscess could reasonably have been found at the VA.

■ The court has no difficulty in disposing of the defense theory that the VA was not negligent because an epidural abscess could not have been reasonably discovered there. This case does not involve an epidural abscess, but rather, the failure to discover osteomyelitis. An epidural abscess is a foreseeable consequence of osteomyeli-

tis. Each expert witness conceded that the object is to diagnose the osteomyelitis as early as possible in order to prevent the development of an epidural abscess. Neurological deficits, which plaintiff never demonstrated at the VA, are a key to diagnosing an epidural abscess. This is beside the point, however, for two reasons: first, because once neurological deficits occur they may be irreversible; second, because the object of a treating physician is to prevent the onset of an epidural abscess and the other complications of osteomyelitis of the spine.

■ The expert testimony reveals that there were many questions left unanswered by the diagnosis of ankylosing hyperostosis. The first of these questions was plaintiff's dramatically increased sedimentation rate. The normal rate is between zero and twenty. Plaintiff's was 120. Sedimentation rate is a crude test whose results may be contaminated by many factors. In general, the sedimentation rate is elevated in the presence of infection. All plaintiff experts and Dr. Smith testifying for the defense agreed that a sedimentation rate this high is not consistent with a diagnosis of ankylosing hyperostosis. Dr. West stated that such a sedimentation rate was an "invitation to a complete work up." Second, plaintiff's white blood cell count was slightly elevated. This, too, is an indication of infection. Third, the alkaline phosphatase enzyme was elevated. This is an indication of either bone or liver disease. Fourth, a pleural effusion (fluid around the lungs) was seen on x-rays taken of plaintiff. This is consistent with a diagnosis of osteomyelitis, but is not consistent with a diagnosis of ankylosing hyperostosis. Fifth, plaintiff's pain was moderate to severe. There was no support in the medical literature relied upon by defense witnesses for the proposition that ankylosing hyperostosis results in this degree of pain. Sixth, plaintiff had an elevated temperature in the face of fever-suppressing drugs. There was a great deal of controversy on this point. Plaintiff's treating physicians at the VA stoutly

contended that plaintiff had no fever—merely an elevated temperature. This view was supported by some of the other defense expert testimony. Plaintiff's experts were in general more cautious and contended that it was their opinion that plaintiff had a fever because his temperature was elevated while he was on fever-suppressing drugs. Seventh, there was a positive bone scan at the VA. Dr. Holton, who was the only qualified radiologist who testified, was of the opinion that the bone scan and the x-rays taken at the VA were inconsistent. Dr. Holton based this opinion on the fact that the ankylosing hyperostosis which was seen on the x-ray extended down the thoracic spine while the bone scan was positive for only the upper thoracic spine. Given the knowledge that plaintiff had a history of *staph. aureus* infection, he stated that he would have made a tentative diagnosis of osteomyelitis on the basis of the bone scan.

Taking all of these factors into account, and taking into consideration the fact that plaintiff was suffering with a number of other ailments at the time of the VA admission, this court is convinced that it was error to diagnose plaintiff as suffering from ankylosing hyperostosis without answering the invitation to more extensive evaluation presented by these unanswered questions.

Two Louisiana cases are instructive in determining that the failure to diagnose osteomyelitis was an act of malpractice by the VA. *Tillman v. Lawson, supra,* involved a case of alleged misdiagnosis of a dormant abscess around teeth which the dentist refilled. In that case, the dentist followed accepted practice by taking a "bitewing" x-ray of the area prior to re-filling the teeth and there were no manifest signs of a dormant abscess such as pus or excretions around the gums. On the basis of this evidence, the court held that the dentist was not negligent. *White v. Edison,* 361 So.2d 1292 (1st Cir.), *writs refused,* 363 So.2d 915 (La.1978), involved a claim that an obstetrician was negligent in failing to re-admit a young mother to the hospital based upon complaints of pain, fever, chills, and distention of the abdomen following the birth of a very large infant. In *White,* the court found the doctor negligent in failing to heed the complaints. *Id.* at 1297. In the instant case, there is no question but that plaintiff had osteomyelitis of the spine at the VA. It is also unquestionable that this case more closely resembles *White* in that there were a number of unexplained symptoms which were not heeded by the VA. This was not a *Tillman* situation in which there were no signs to put the treating physicians on notice. On the contrary, there were a number of unanswered questions, enough to put the VA on notice that ankylosing hyperostosis was not the cause of plaintiff's pain. As with the issue of failure to follow up the differential diagnosis, causation is proven in this case because timely treatment is the only guarantee against permanent neurological damage

## D IMPROPER FOLLOW–UP:

Plaintiff alleges malpractice by the VA for improper follow-up after discharge. There are two parts to his contentions. First, he argues that it was negligence not to establish a plan to follow up his progress after discharge from the hospital. Second, he asserts that the VA failed to request the Wadley I records timely and that the VA did not properly follow up on these records once received.

The evidence was almost uniform on the contention that the VA was negligent in not establishing a follow-up plan for Sewell after his discharge. Drs. McRaney, Saunders and West, testifying for the plaintiff, and Drs. Smith, Menoni and Benzel, testifying for the defense, all stated that the physicians at the VA should have followed Sewell's progress after his discharge. In the words of Dr. Benzel, by not requiring Sewell to return for follow-up at the VA, "they had essentially, blocked off the possibility of further workup." (Deposition at 57.) As was discussed in the previous sections, the prevention of timely treatment established the statutorily required element that the malpractice be ap-

proximate cause of harm to plaintiff. In this case, failure to treat plaintiff's osteomyelitis timely prevented medical intervention before the onset of neurological deficits. At that point, the damage to the spine is potentially irreversible.

■ The testimony was equally uniform on the issue of the VA's failure to request timely, and follow up on, the Wadley I records. These records were requested by the VA, but were not received until *after* plaintiff's discharge. Dr. Redetzki testified that she did not review these records when received. Obviously, there was no follow-up on them at that time. In retrospect, it is clear that the records from Wadley I were important for the proper treatment of plaintiff at the VA. The records contain the specific identification of the bacteria found in Sewell's blood stream at the Wadley Hospital; they outline the course of treatment there; and they contain x-rays and a bone scan performed there. The testimony showed that a comparison of the bone scan at the VA with the one from Wadley I should have ruled out a diagnosis of ankylosing hyperostosis due to the dramatic difference between the two. It appears that ankylosing hyperostosis is not a disease which shows dramatic change over a few weeks' time. With hindsight, then, it is clear that these records were crucial for a proper diagnosis of ostemyelitis at the VA, but that is not the question. The question which concerns this court is whether the failure to obtain timely and follow up upon them constitutes malpractice.

Several doctors testifying for plaintiff stated that they considered records of a recent prior admission to be so important that they would have phoned the Wadley Hospital in order to obtain the necessary data. Other experts testified that it was their opinion that the records should have been read upon receipt and then followed up by the VA physicians. Dr. Menoni, testifying for the defense, stated that there was a duty to continue to care for plaintiff after the records were received, and that it was an error not to follow through with his

care after the records were received. (Deposition at 62 and 77.) The Wadley I records would have made a diagnosis of osteomyelitis more probable, and thus would have led to timely treatment of this condition. The failure to diagnose and treat Sewell timely for osteomyelitis was the proximate cause of injury to him. Consequently, he has carried his burden in proving that it was negligent not to obtain and follow through on the Wadley I records. *See White v. Edison,* 361 So.2d at 1295 (finding negligence in failure to treat patient in need of care).

### E IMPROPER EMERGENCY ROOM TREATMENT:

■ Mr. Sewell returned to the VA Hospital on July 9, 1981. At that time he was seen in the Emergency Room by Dr. John Smith, a first-year resident in psychiatry. Dr. Smith had begun his residency at the VA on July 1, 1981. Prior to this time, he had one year's training in family practice. Dr. Smith took *no* detailed history and made no physical examination of Sewell. Plaintiff's wife stated that plaintiff had a red lump the size of a goose egg on his back at this time. This lump would blanch when pressed. Sewell was not admitted to the hospital at this time, nor were his Wadley I records—then in the possession of the VA—reviewed. Dr. Smith increased the dosage of one of plaintiff's medications and gave him a shot of Celestone IM.

Testimony is uniform that the treatment of plaintiff at the VA Emergency Room fell below the standard of care required of a treating physician. This was the opinion of experts for both the plaintiff and the defense. The testimony was also uniform on the point that if proper procedure had been followed at the time it would still have been possible to prevent neurological damage to the plaintiff. As has been previously noted in this opinion, it is essential to begin treatment of osteomyelitis as quickly as possible. The VA's failure to do so prevented the proper diagnosis of his condition until after the neurological deficits had already

set in. *See Fanguy v. U.S.*, 595 F.Supp. 456, 461 (E.D.La.1984).

## IV DEFENSE THEORIES

██ The defense theory of the case was to place blame elsewhere. To this end, the defense argued that Sewell contributed to his own injury by an application of DMSO (dimethyl sulfoxide) in an attempt to control his pain. The DMSO used by plaintiff was a cream which his daughter thought might help his back pain. Although the testimony of Dr. King makes it clear that one of the properties of DMSO is that it suppresses the local immune system by interfering with the functioning of the body's white blood cells in the control of infection, this fact has no bearing on the present case. The applications of DMSO were made in May 1981. Plaintiff was admitted to the VA in June of that year. There was absolutely no testimony that the two applications of DMSO made by plaintiff would have affected the VA's ability to make a proper diagnosis. The only testimony directly on point shows that the May applications of DMSO would have had no effect on the VA since the DMSO was used a month prior to the VA admission. In fact, the DMSO was applied by plaintiff's daughter at his home prior to the Wadley I admission.

██ The defense also centered on plaintiff's treatment at Wadley Hospital, both prior to and following his admission to the VA Hospital in June. In retrospect, it is clear that the diagnosis of osteomyelitis was also missed by Wadley during Sewell's first admission there. However, there was no testimony that the failure to diagnose osteomyelitis at that time fell below the standard of care. One crucial distinction between the Wadley I admission and the VA admission is that the bone scan obtained at Wadley I was negative, while the bone scan at the VA was positive. Although Dr. Holton testified that, in retrospect, he would have read the Wadley I bone scan as positive, he stated that it was not beyond the required standard of care to read it negative. There was also clear

evidence that the plaintiff was improperly treated during Wadley I, in that the antibiotic treatment given was too short for *staphylococcus aureus*. The defendant asserts that this improper treatment at Wadley I masked plaintiff's symptomology and made a proper diagnosis at the VA impossible. It was the opinion of Dr. King, for example, that the treatment at Wadley I suppressed, but did not eradicate, the *staph* infection which was ultimately determined to be the cause of plaintiff's osteomyelitis.

There are two problems with this theory. First, the VA should have detected the inadequacy of the treatment during Wadley I and used this information in formulating its own diagnosis. Dr. Menoni, testifying for the defense, stated that "had I the [Wadley I] records in front of me, I would have come to the conclusion that the patient had been inadequately treated for *staphylococcus aureus sepsis*. And knowing that he had had back pain and a *staph. aureus* organism—and I emphasize *aureus* because of its known problem with infecting bones—that my personal thinking would have been toward looking for osteomyelitis at the given time on the VA admission." (Deposition at 20–21.) The second problem with this theory is that there is no causal relationship between the treatment at Wadley I and the failure of the VA to diagnose osteomyelitis. On cross-examination by the defense, Dr. Saunders was asked whether it was his opinion that the Wadley I treatment masked the plaintiff's symptomology at the VA. He responded no, he did not think that the infection was masked, in the sense of hidden from view, at the VA, because there were many symptoms to indicate osteomyelitis. He stated that the failure to spot the osteomyelitis at the VA was the whole point. The doctors at the VA should have detected that disease. As Dr. Menoni testified, had the VA made the proper diagnosis, the prior treatment, whatever its quality, would not have prevented a proper outcome. (Deposition at 47.)

■ Finally, the defense points to inadequacies in Sewell's subsequent treatment at the Wadley Hospital (Wadley II). In general, the defense points to a delay in surgical treatment and improper post-operative care. The improper treatment at Wadley II has no bearing on this case. First, under Louisiana law, the plaintiff need only show that the defendant's conduct is "a necessary antecedent of plaintiff's harm but it need not be the sole cause contributing to the harm." *Straley v. Calongne Drayage & Storage, Inc.*, 346 So.2d 171, 175 (La.1977). The defendant's conduct need only be a "substantial factor without which the accident would not have occurred...." *Charpentier v. St. Martin Parish School Board*, 411 So.2d 717, 720 (La.App. 3d Cir.1982) (citing *Laird v. Travelers Ins. Co.*, 267 So.2d 714 (La.1972). There is no doubt that the failure of the VA to diagnose osteomyelitis was a substantial factor in causing the paralysis which Sewell now suffers. Second, the epidural abscess which required surgical treatment during Wadley II was a foreseeable consequence of the osteomyelitis. Once this stage was reached, the medical testimony was unanimous that there was no guarantee that any neurological damage could be reversed. Third, any liability on the part of the Wadley Hospital would simply make the Wadley a joint tortfeasor with the VA. Under Louisiana law, joint tortfeasors are solidarily liable. La.Civ. Code art. 2324. The tort victim may sue any solidary obligor for the entire amount of damages. La.Civ.Code art. 1795 (formerly arts. 2094 and 2095.) *See also Roberts v. Russo*, 400 So.2d 354, 356 (La.App. 4th Cir.1981) (two surgeons allegedly performing separate operations need not be joined in same suit because liability would be solidary). Thus, it is clear that any negligence on the part of Wadley Hospital does not break the causal link between the VA's negligence and the plaintiff's injuries. *See Weber v. Charity Hospital*, 475 So.2d 1047, 1050 (La.1985) (tortfeasor also liable for any malpractice involved in treating injuries directly caused by the tortfeasor). There was no third-party practice against Wadley by the defendant, and no explanation was offered for its absence.

## V DAMAGES

Under Louisiana law, the tortfeasor is under an obligation to compensate his victim for the damage done. It is well settled that a tort victim must be compensated for his past medical expenses, future medical expenses, past lost earnings, loss of earning capacity and general damages for pain and suffering, mental anguish, and any disability. The plaintiff, of course, carries the burden of establishing these damages by a preponderance of the evidence. On the one hand, this means that the plaintiff is not entitled to an award of speculative damages for any injuries which he might suffer in the future. On the other hand, a reasonable effort must be made to approximate the damages which the plaintiff has proved are more probable than not. Even though they cannot be computed with mathematical certainty.

Plaintiff's past medical expenses are well documented by numerous submissions to this court. By stipulation, the parties have agreed "that the medical expenses set forth in plaintiffs' exhibits are correct as to amounts and were reasonably incurred as a result of the medical condition created by his disease [sic] entity which caused neurological disfunction July 16, 1981, and thereafter." These past medical expenses totaled $223,980.43.

Plaintiff's current medical condition and expected prognosis were discussed by Drs. Gaddis and Roundtree. Dr. Gaddis, a neurologist, testified that plaintiff feels pain from his chest to his toes and suffers from a sensation of burning or "frozen" feet. Plaintiff suffers from weakness in his lower extremities, which makes walking slow and painful. It was Dr. Gaddis's opinion that plaintiff could stand for only two or three minutes before his legs would cave in. Sewell has abnormal reflexes, and his toes drag when he walks. This makes movement difficult, even with the benefit of an aluminum walker. Plaintiff has no sexual functions and cannot spontaneously

evacuate his bowels. Dr. Gaddis described Sewell as a "functional paraplegic" who will continue to deteriorate. Dr. Gaddis also stated that Sewell's current status is directly related to his spinal cord injury.

Dr. Roundtree testified that plaintiff suffers from a neurogenic bladder. This means that the bladder muscles become tightened or contracted. As a result, plaintiff suffers what Dr. Roundtree characterized as "reflux," a condition whereby urine backs up into the kidney. These conditions are directly related to plaintiff's spinal cord injury. In April 1982, an external sphincterotomy was performed on plaintiff. This surgery was performed to allow urine to freely drain. As a result, Sewell must use a catheter at all times. Dr. Roundtree considers plaintiff a good candidate for kidney dialysis in one to two years. This assessment is based on an evaluation of several tests which measure kidney performance. Creatinine is a breakdown product of metabolism. The kidneys function to remove this substance from the blood. Elevated levels of *serum creatinine* (creatinine in the blood), such as with plaintiff, indicates that the kidneys are not functioning. Plaintiff also has a dramatically decreased creatinine clearance level which measures the rate at which the kidneys filter creatinine from the blood. 70 to 120 cc's per minute is the normal rate. Plaintiff's clearance is approximately 21 cc's per minute. Dr. Roundtree testified that when the creatinine clearance falls below 10 cc's per minute, a patient is a candidate for kidney dialysis. Dr. Roundtree stated that Sewell would probably be on dialysis in one or two years and that after dialysis began he would only have five or six years' life expectancy.

In computing future medical expenses, Dr. Clauretie, professor of finance and a Certified Public Accountant, based his estimates on only a six-year life expectancy. The first component of Dr. Clauretie's estimate of plaintiff's future medical expenses involved at-home nursing care. He estimated this expense by taking an average cost of $5 per hour, assuming a 12-hour day, and a 360 days a year of at-home nursing care. Dr. Clauretie further assumed that nursing care expenses would increase at a rate of 4 per cent per year. Using a 9 per cent discount rate, he estimated that the present value of future nursing care would be $110,312. The one error in this analysis is that it does not take into account the periodic hospitalizations which Sewell requires. During these hospitalizations, at-home nursing care would not be required. Accordingly, it is felt that a 25 per cent reduction in Dr. Clauretie's estimate is required. Plaintiff, therefore, is entitled to recover $82,734 to cover future at-home nursing care.

The second component of Dr. Clauretie's estimate of future medical expenses was the cost of kidney dialysis. Dialysis currently costs $27,000 per year. Dr. Clauretie assumed that this cost would increase annually at a rate of 5 per cent. He further assumed that only five years of dialysis would be required. Using a 9 per cent discount rate, Dr. Clauretie estimated that the present value of kidney dialysis services which plaintiff would require in the future is $116,410. The third component of Dr. Clauretie's estimate of future medical expenses was the cost of medications which plaintiff must take as a direct result of his spinal cord injury. Dr. Clauretie assumed that the cost of these medications is currently $288 per month and that the cost would increase 5 per cent annually. Using a 9 per cent discount rate, Dr. Clauretie estimated that the present value of future medical expenses was $18,230. Testimony in this case demonstrated that not all drugs used in reaching the $288 per month figure were related to Sewell's spinal cord injury. These unrelated drugs amounted to approximately 20 per cent of the total monthly bill. Accordingly, Dr. Clauretie's estimate should be reduced by that amount. This results in a present value for future medical expenses of $14,584. The plaintiff also must use catheters as a result of his neurogenic bladder. The present value of this expense is $3,206.

Future hospital expenses is the final component in estimating plaintiff's future medical expenses. Dr. Clauretie testified that Sewell currently expends approximately $1,097 per month in hospital expenses directly related to his spinal cord injury. This is a yearly expense of $13,163. Assuming that these expenses will increase annually at a rate of 5 per cent and further assuming a 9 per cent discount rate, Dr. Clauretie estimated that the present value of future hospital expenses is $69,351.

The next element of recovery concerns past lost earnings between the date of injury and the time of trial. Plaintiff was a truck driver for Auto Convoy Company. He drove trucks which transported automobiles, and was a member of the Teamsters Union. In estimating the amount of lost wages, Dr. Clauretie looked at the wages of a driver comparable to Sewell. Immediately prior to his injury, Sewell earned approximately 75 per cent of the wages of the comparable driver. Although the trucking wages for the comparable driver increased at an annual growth rate of 8.23 per cent, and although the average earnings of individuals employed in trucking increased by 5.9 per cent according to the United States Department of Labor, Dr. Clauretie estimated that Sewell's earnings would have increased at a 5 per cent growth rate. Dr. Clauretie further assumed that 20 per cent of plaintiff's wages would go to cover expenses not paid by his employer. Dr. Clauretie termed this the "most conservative" approach. There was testimony at trial concerning the average wages of drivers with top seniority. Although Sewell clearly fell within this category due to his seniority, it is felt that estimates based upon comparisons with these drivers would be speculative due to differences in the type of rigs driven and plaintiff's record of past earnings. Thus, using what Dr. Clauretie termed his "conservative" approach, it is clear that Sewell is entitled to recover $100,326 in past lost income.

Lost earnings capacity (or lost future wages) is the next element of recovery. There are two components to plaintiff's lost earning capacity. The first component con-cerned the wages which plaintiff would have earned from January 1, 1986 until December 31, 1989, the estimated date of retirement at age 65. Assuming that plaintiff's wages would increase annually at a rate of 5 per cent, and further assuming a 9 per cent discount rate, Dr. Clauretie estimated that the present value of plaintiff's lost earnings is $92,658. This is a conservative approach, and the court sees no error in this estimate. The second component in calculating Sewell's lost earning capacity is the difference in retirement pay which plaintiff would have received had he retired at age 65 rather than taking early retirement as a result of his spinal cord injury. Because Sewell took early retirement, he received a pension of $625 per month, or $7,500 annually. Had plaintiff retired at age 65, he would have received $1,000 per month or $12,000 annually. From March 1982 through October 1985, retirement benefits of the Teamsters Pension Fund grew at an annual rate of 10.7 per cent. Dr. Clauretie assumed that this trend would continue and that these benefits would increase at a 10 per cent annual rate until January 1990, the date at which plaintiff would have retired at age 65. Assuming this 10 per cent growth rate, plaintiff's pension would be approximately $1,300 per month, or $15,600 per year. Absent injury, Sewell's life expectancy is 75.8 years, or approximately until the end of year 2001. Using these figures and a 9 per cent discount rate, Dr. Clauretie estimated that the present value of lost retirement benefits is $41,090. Thus, the total lost earning capacity amounts to $133,748.

The next element of recovery concerns general damages for pain and suffering, mental anguish and disability. Plaintiff is now a paraplegic. He suffers pain in his lower extremities which Dr. Gaddis characterized as severe and continuous. He has undergone numerous operations as the result of his spinal cord injury. When Dr. West first examined plaintiff at Physicians and Surgeons Hospital at Shreveport, Louisiana, in October 1981, he characterized Sewell as an invalid. Dr. West treated him for his *staph* infection with intra-

venous antibiotic therapy "as long as it was humanly possible to do so without endangering organs that are sometimes damaged by the treatment. . . ." (Deposition at 8.) During this hospitalization, it became difficult to establish an intravenous line, and plaintiff required insertions into the subclavian vein, a cutdown (a surgical procedure in which the skin is cut open and the needle is inserted into the vein under direct visualization) and a jugular vein insertion. While at St. Luke's Hospital, Sewell spent approximately one month on a Stryker frame. The Stryker frame is constructed to allow a patient to be turned on an axle from a stomach down to a back down position such that the patient does not have to turn himself. This frame resulted in excruciating pain for him and he testified that while he was on the frame he wished he were dead and told this to his wife and anybody else who would listen. Plaintiff enjoyed his life as a trucker and had many friends along the highway. He looked forward to traveling during his retirement and spending time with his family. As a result of his injury, he is now essentially house bound and suffers the embarrassment of being unable to control his bodily functions. He requires the constant assistance of his wife for even the most menial and personal of tasks. Plaintiff's doctors characterized him as being depressed. In light of this situation, a general damage award of $300,-000 is not unwarranted.

Finally, Mrs. Sewell seeks recovery for loss of consortium and for the fair value of her constant care and assistance to her husband. The tortious conduct in this case occurred in 1981. Civil Code art. 2315 was amended in 1982 to provide for the type of recovery which she seeks. The 1982 amendment to this article is not applied retroactively. *See, e.g., Abadie v. Commercial Union Insurance Company*, 464 So.2d 979 (La.App. 4th Cir.1985). Although well deserving an award in her own right, Mrs. Sewell has no legal basis for her recovery.

VI CONCLUSION

Counsel for all parties, through their diligent efforts, have ably assisted this court in this most difficult case. After an extensive review of the evidence, it is concluded that plaintiff has fulfilled his statutory burdens under La.R.S. 9:2794. As a result of this malpractice, plaintiff has sustained damages totaling $1,044,339.43.

A Judgment consistent with the terms of this written Opinion shall issue herewith.