**Tommie Wiggins GARRETT et al.**

v.

**UNITED STATES of America.**

**Civ. A. No. 85–2890.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Sept. 1, 1987.

---

James M. Johnson, Campbell, Campbell & Johnson, Minden, La., for plaintiffs.

U.S. Attorney Joseph S. Cage, and Asst. U.S. Atty. David A. Titman, Office of the U.S. Atty., Dept. of Justice, Shreveport, La., for defendant.

## MEMORANDUM OPINION

STAGG, Chief Judge.

## I.  INTRODUCTION

In this medical malpractice case, the patient entered the hospital on May 8, 1984 through the doors of the Emergency Room; he exited thirty-two days later through the back doors of the morgue.  The wife and three major children of that patient have filed this suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, for the alleged wrongful death of Bennie Ray Garrett, Sr. at the Veterans' Administration Medical Center in Shreveport, Louisiana ("VA").  The Garretts have undoubtedly undergone every family's nightmare: Mr. Garrett underwent emergency surgery for life threatening conditions; however after initially doing well following the operation, he developed complications from which he never recovered.  No one wants to believe that any human being can be that helpless in the face of modern medical technology. The sad truth, however, is that, for all of medicine's technological advances, some patients cannot be saved.  Mr. Garrett could not be saved from the ravages of his postoperative complications despite the best ef-

forts of the team of surgeons treating him. This court finds no malpractice on the part of the VA, its staff, or its physicians.

Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances...."  28 U.S.C. § 2674. Since Mr. Garrett died in Louisiana, the court will apply its law to the facts found on this record.  *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); 28 U.S.C. § 1346(b).

## II.  APPLICABLE LEGAL STANDARDS

This court recently reviewed the standard under Louisiana law for the imposition of liability against a hospital in *Biggs v. United States*, 655 F.Supp. 1093, 1094–95 (W.D.La.1987):

La.Civ.Code art. 2315 provides that every person who causes damage to another by his fault is obligated to repair the damage.  The Louisiana Civil Code further provides that every person is responsible, not only for damages occasioned by his own act, but also for damages caused by the acts of persons for whom he is answerable.  La.Civ.Code art. 2317.  Under the Louisiana Civil Code, an employer is answerable for the damages occasioned by his employees in the exercise of their duties.  La.Civ.Code art. 2320.  Louisiana courts apply a duty-risk analysis in assessing liability under these articles of the civil code.  *See Dixie Drive It Yourself System v. American Beverage Co.*, 242 La. 471, 137 So.2d 298 (1962).

Louisiana courts also apply this duty risk analysis in cases alleging medical malpractice against hospitals.  *See, e.g., Belmon v. St. Frances Cabrini Hospital*, 427 So.2d 541 (La.App. 3d Cir.1983); *Daniel v. St. Francis Cabrini Hospital of Alexandria, Inc.*, 415 So.2d 586 (La. App. 3d Cir.1982); *see also Sibley v. Board of Supervisors of Louisiana State University*, 477 So.2d 1094, 1099 (La.1985).  Under this duty-risk analysis, the plaintiff must demonstrate (1) that the hospital's actions were a cause-in-fact of injury; (2) that the hospital owed him

a duty which was imposed to protect against the risk involved; (3) that the hospital breached that duty; and (4) that he suffered an injury.

The cause-in-fact determination is straightforward and simple. In order for the defendant's conduct to be a cause-in-fact of a plaintiff's harm, it must be shown to be a substantial factor in causing the injury. *See Belmon,* 427 So.2d at 543....

A hospital's duty to its patients has been described in numerous cases in the Louisiana jurisprudence. The leading Supreme Court case is *Hunt v. Bogalusa Community Medical Center,* 303 So.2d 745 (La.1974). The *Hunt* court stated:

A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control.

303 So.2d at 747. *See also Ray v. Ameri-care Hospital,* 400 So.2d 1127, 1138 (La.App. 1st Cir.1981). "A hospital has a duty to provide and maintain adequate facilities and supplies and a competent staff so as to provide competent care to its patients." *Sibley v. Board of Supervisors of Louisiana State University,* 490 So.2d 307, 311 (La.App. 1st Cir.1986). Louisiana jurisprudence also holds "that a hospital is responsible for the negligence of its employees including, inter alia, nurses and attendants, under the doctrine of respondeat superior." *Daniel,* 415 So.2d at 589, *see also Sibley,* 477 So.2d at 1099; *Belmon,* 427 So.2d at 544. The guidelines of the Joint Committee on Accreditation of Hospitals serve as evidence of the medical profession's accepted standard of care. *Sibley,* 490 So.2d at 311–12.

The determination of whether the hospital has breached its duty of care "depends upon the facts and circumstances of the particular case." *Ray,* 400 So.2d at 1138; *Hunt,* 303 So.2d at 747; *Daniel,* 415 So.2d at 589; *see also Bossier v.*

*DeSoto General Hospital,* 442 So.2d 485, 488 (La.App. 2d Cir.1983). However, a hospital is not an insurer of the patient's safety. *Ray,* 400 So.2d at 1138; *Smith v. Doe,* 483 So.2d 647, 650 (La.App. 4th Cir.1986). Nor is a hospital responsible for guarding against occurrences that a reasonable person would not anticipate. *Ray,* So.2d at 1138–39; *Smith,* 483 So.2d at 650.

The standard under Louisiana law for a physician malpractice claim was set forth by this court in *Sewell v. United States,* 629 F.Supp. 448, 451, 455 (W.D.La.1986):

Under Louisiana law, the plaintiff in a medical malpractice action has a three-part burden of proof. First, in a case such as this brought against specialists, "the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty." La.R.S. 9:2794(A)(1). Second, the plaintiff must prove that "the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill...." La.R.S. 9:2794(A)(2). Third, the plaintiff must prove that he suffered injuries "as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care...." La.R.S. 9:2794(A)(3).

\* \* \* \* \* \*

In determining whether the plaintiff has met his burden of proof, the court relies on the testimony and opinion of medical experts. *Fanguy v. United States,* 595 F.Supp. 456, 460 (E.D.La. 1984); *Steinbach v. Barfield,* 428 So.2d 915, 919 (La.App. 1st Cir.1983). This expert testimony must be tempered by the knowledge that Louisiana law does not hold the physician to a standard of perfection. A treating physician—whether a general practitioner or specialist—is only liable if his actions fall below that standard of care ordinarily exercised under similar circumstances by members of his profession. *Meyer v. St. Paul-Mercury Indemnity Co.,* 73 So.2d 781 (La. 1954). The standard for a medical spe-

cialist is "to exercise the degree of knowledge or skill ordinarily exercised and possessed by physicians in his medical specialty. *Babin v. St. Paul Fire & Marine Insurance Co.*, 385 So.2d 849 (La.App. 1st Cir.1980)". It must also be remembered that under Louisiana law, "injury alone does not raise a presumption of the physician's ... negligence." La.R.S. 9:2794(C).

## III. MEDICAL HISTORY

Garrett was a twenty-two year Army veteran. He served in the Korean War and had two tours of duty in Vietnam. He was crew chief for helicopter mechanics, and had obtained the rank of sergeant. After his discharge from the Army, Garrett worked at several different jobs. He and his family eventually returned to Louisiana where he managed a truck stop for Pel State Oil Company on Goodwill Road in Webster Parish. In 1984, Garrett had worked ten years at that station. Typically, he worked twelve hours a day, five days a week.

Garrett worked a full day on May 7, 1984. He did not eat dinner that evening as he was not feeling well, and went to bed at 6:00. At 10:00, he woke up and informed his wife that his stomach hurt. He began throwing up, and his wife noticed blood in the vomit. Garrett declined to go to the hospital at that time. One hour later, he began vomiting blood again. This time, his wife called an ambulance. Although Garrett had hospitalization insurance through Pel State, he told his wife that he wanted "to go where old soldiers go," and he was taken by ambulance to the VA.

Garrett arrived at the Emergency Room of the VA in the early morning hours of May 8, 1984. He gave a two-day history of vomiting blood, black stool, two fainting episodes, and a nine-day history of nosebleeds. (Med.Rec. at 8).[1] He also gave a history of drinking from two to three beers per worknight and up to five beers on non-workdays. He was admitted to the Surgical Intensive Care Unit ("SICU") with the diagnosis of upper gastrointestinal bleeding. *Id.* An emergency gastroscopy was performed in those early morning hours. This procedure entails placing a fiber optic instrument down the esophagus and allows the physician to examine the esophagus and the stomach. (Dr. Cook at 4). During the gastroscopy, a large blood clot was observed in the greater curve of the stomach; however, the doctors did not see any active bleeding. (Med.Rec. at 9; Dr. Cook at 4). X-rays later demonstrated a possible ulcer. (Med.Rec. at 190). Garrett was given several units of blood, and conservative treatment of a stomach ulcer was begun. His condition improved, and Garrett was moved from SICU to a regular ward on May 11. Garrett did well on the ward, although, according to one of the treating physicians, he began to exhibit symptoms of alcohol withdrawal on May 11. This withdrawal was treated with librium. (Med.Rec. at 12; Dr. Cook at 6; Dr. Spires at 22–24).

As with most teaching hospitals, Garrett was treated at the VA by a team of physicians. Dr. Don Morris was the chief of Surgical Services at the VA, and Dr. William Spires was assistant chief of Surgical Services. (Dr. Spires at 3, 8). Both doctors were surgical professors at Louisiana State University Medical School in Shreveport. *Id.* Working under those two doctors was a group of surgical residents. Dr. John Gladney was chief resident in his fifth year of residency. Dr. John Cook was in his fourth year of residency. Additionally, there were a number of junior residents in their first or second year of residency. As chief resident, Dr. Gladney supervised all of the other residents delegating routine procedures and mundane chores to the junior residents. As the second most senior

---

**1.** The medical record in this case consists of a large bound volume broken into 33 different categories, e.g., progress notes, laboratory reports, etc. Every other page is numbered. The numbering of alternate pages was done by plaintiffs' counsel since the original pages contained writing on both sides. The reference to page numbers in this opinion will refer to both the front (numbered) side as well as the reverse (unnumbered) side without any specific notation that it is the reverse (unnumbered) page which is being cited.

man, Dr. Cook's primary responsibility was the care of SICU patients. (Dr. Spires at 5, 17–18). Drs. Gladney and Cook performed all technically demanding surgeries and directly handled the more difficult cases. (Dr. Spires at 7). All patients were seen by staff physicians—such as Drs. Morris and Spires—on a regular basis with the residents and any medical students in attendance. (Dr. Spires at 8, 18).

In the early morning of May 12, 1984, five days after his admission, Garrett got out of his hospital bed to go to the ward bathroom to smoke a cigarette. While there, he vomited a large amount of dark blood and was transferred back to the SICU. (Med.Rec. at 12). A second gastroscopy was performed, and a large blood clot was again observed in the stomach. (Med.Rec. at 14; Dr. Cook at 7–8). Mr. Garrett refused surgery at this point prompting doctors to use a Senstaken-Blakemore tube in an attempt to stop the bleeding by inflating a balloon at the end of the tube to apply pressure to the bleeding site. (Testimony of Dr. Gladney; Dr. Cook at 9, 36, 38). However, this procedure was unsuccessful after two attempts and was described by the doctors as being quite uncomfortable to the patient. Garrett refused a third attempt to stop the bleeding with a Senstaken-Blakemore tube. (Med.Rec. at 14; Dr. Cook at 9, 36–7; Dr. Spires at 10).

The physicians uniformly testified that it is a highly significant problem when a patient re-bleeds in the hospital. (Dr. Cook at 8; Dr. Spires at 8, 13; testimony of Dr. Gladney). The bleeding episodes had resulted in hypotension, or low blood pressure. (Testimony of Dr. Gladney; Dr. Cook at 10). Hypotension results in rapid heartbeats and may require intravenous fluids to elevate the blood pressure and slow the heart. *Id.* The treating physicians testified that they had determined that Garrett was a candidate for surgery and that he refused to allow it. (Dr. Cook at 9, 36, 38; Dr. Spires at 8; testimony of Dr. Gladney). The decision to operate was apparently made during the early morning rounds with Dr. Morris on Saturday, May 12, 1984. (Dr. Spires at 8).

Two problems confronted the VA physicians at this time. First, they had no definite site of the upper gastrointestinal bleeding: either Garrett had varices (enlarged veins) in his esophagus or he had a bleeding stomach ulcer. (Med.Rec. at 14; Dr. Cook at 8; Dr. Spires at 11). Second, Garrett began complaining of exquisite pain in his left leg. Upon examination, it was determined that he had lost the pulses in that leg which indicated some sort of blockage or other vascular disorder in a major artery in that leg. (Med.Rec. at 14; Dr. Cook at 10; Dr. Spires at 9–11). Due to these problems, the doctors decided to obtain an arteriogram to determine the cause of the vascular disorder in Garrett's leg and to locate the exact source of bleeding in his upper gastrointestinal tract. (Dr. Cook at 9–10; Dr. Spires at 11). Mr. Garrett was transported by ambulance to the LSU Medical Center for the tests because the VA personnel and equipment were unavailable.

The arteriogram showed a source of bleeding in the stomach and a complete blockage of the superficial femoral artery, the main artery supplying blood to the left leg. (Med.Rec. at 15; Dr. Cook at 10–11; Dr. Spires at 9, 13). Since varices had been eliminated as the cause of Garrett's upper gastrointestinal bleeding, surgery was necessary to stop that bleeding. (Dr. Cook at 11; Dr. Spires at 13). Without this surgery, Garrett could have bled to death. (Dr. Cook at 13). Additionally, surgery was necessary to restore blood flow to the left leg. Without surgery on the leg, Garrett faced the loss of that leg, gangrene and possible death. (Dr. Spires at 10).

Garrett's condition continued to deteriorate on May 12, 1984. He was severely hypotensive from his blood loss and became confused and unable to comprehend the need for surgery. (Med.Rec. 15; Dr. Cook at 11, Dr. Spires at 8–9). Consent for the surgery was obtained from Tommie Garrett, his wife, and Mr. Garrett underwent surgery to his stomach and left leg beginning at approximately 6:00 or 7:00 that evening. *Id.* Dr. John Gladney, the chief surgery resident at the VA, per-

formed the surgery which did not end until sometime around 4:00 the next morning. During this surgery, Dr. Gladney was assisted at various times by two other residents and by Dr. William Spires, the attending physician. (Dr. Cook at 30).

Garrett's surgery involved an exploratory laparotomy in which a large incision was made to allow the doctors to enter the peritoneal cavity and to observe the stomach, gall bladder, liver, and intestines. A gastrectomy was performed in which a large portion of Garrett's stomach was removed. The removal of this large amount of the stomach required two other surgical procedures to be performed: a vagotomy in which two nerves were divided in order to reduce acid production in the stomach; and a junostomy in order to connect the remaining stomach to the intestines. (Dr. Spires at 15–16). The abdominal part of the surgery took from four to four and one-half hours. (Testimony of Dr. Gladney; Dr. Deitch at 9). The surgery on Garrett's leg also took from four to four and a half hours. Dr. Gladney opened the femoral artery of the left leg and performed a thrombectomy, or excision of the blockage of the artery, with a skin graft. A fasciotomy, in which connective tissue around the leg muscles was divided, was also performed on the leg. Swelling always occurs following the reestablishment of blood flow to an extremity, and the purpose of the fasciotomy is prevent the swelling from restricting blood flow to the leg after surgery. (Dr. Spires at 15–16). The surgery was a success. Garrett's stomach bleeding stopped and normal blood flow was resumed to his leg. (Testimony of Dr. Gladney; Dr. Cook at 14).

Garrett did well during and immediately following the surgery. His vital signs were good, and he was able to be removed from the ventilator. The Garrett family visited with him the morning after the surgery as well as the following day. They left the VA at approximately 8:00 at night on May 14, 1984.

At 8:35 P.M. that night, Garrett began a sudden hacking cough and then suffered a near respiratory arrest. (Med.Rec. at 20, 21, 22). He stopped breathing and began to turn blue. The emergency "code blue" was sounded, and a number of doctors immediately responded. *Id.* Garrett was put on a ventilator, and his trachea was suctioned to help eliminate fluids from his lungs. The junior resident who performed the suctioning noted in the chart that he appeared to suction from the trachea what seemed to be "gastric fluid." (Med.Rec. at 22). Garrett's blood pressure was low and his pulse rapid, so he was given intravenous fluids to raise his blood pressure and slow his heartbeat. (Testimony of Dr. Gladney; Dr. Cook at 16; Dr. Deitch at 17). X-rays were taken, and arterial blood gas studies were performed to see how much oxygen Garrett's lungs were delivering to his blood stream. Additionally, a Swan-Ganz catheter was inserted. (Med.Rec. at 22). The Swan-Ganz catheter was inserted in Garrett's neck artery and then threaded through his heart into the left lungs. The Swan-Ganz measures various cardiac pressures and is used to diagnose heart problems. (Dr. Deitch at 18–19).

Based on the information received from the notes in the medical record, the X-rays, blood gas studies, and the arterial pressure readings from the Swan-Ganz catheter, Drs. Gladney and Cook determined that Garrett's near respiratory arrest was not caused by any heart problem, i.e. that it was not of cardiac origin. Both Drs. Gladney and Cook believed that Garrett had aspirated gastric contents. (Testimony of Dr. Gladney; Dr. Cook at 15–16, 51). The aspiration of gastric contents or any foreign substance into the lung is toxic to the lungs and can cause fluids to seep into the lungs from blood vessels thus resulting in significant respiratory problems. (Dr. Cook at 16; Dr. Deitch at 33–34). A diagnosis of adult respiratory distress syndrome (ARDS) was made. ARDS was described by Dr. Edwin Deitch as:

> That is a disease which is defined by what happens. It is sort of a waste basket for a number of etiologies that cause a certain pathological and clinical syndrome. The pathology is called congestive atelectasis and that means that you get blood vessels that are full of

blood and lungs that collapse so that the lung begins to look like liver. And the causes of it are multiple and it's really unclear what the absolute cause is. But it is associated with individuals who have been under major stress from a trauma, blood loss, shock, infection. You can get it with smoke poisoning type injuries. So it is sort of a syndrome that is a common denominator for severe injury to a person's body. And what happens is, for some reason that is not understood, the lung fills and when it fills it loses the ability to keep the fluid within the blood vessels and it leaks out into the tissues. (Dr. Deitch at 33–34). X-rays taken of Garrett after the near respiratory arrest showed pulmonary edema (significant fluid in the lung), or in layman's terms, "wet lung." (Dr. Vickers at 12). The treating physicians ruled out a cardiogenic cause of the pulmonary edema and treated Garrett for ARDS by placing him on a ventilator, giving him intravenous fluids to maintain his blood pressure, using dopamine to increase his blood pressure and boost cardiac output, and using the Swan-Ganz catheter to monitor arterial pressures. (Dr. Deitch at 18). Garrett's respiratory function eventually improved to the point where he only needed the ventilator. (Dr. Cook at 17; Dr. Vickers at 41–45). However, other organ systems began to fail. On approximately May 20, 1984, Garrett's kidneys began to fail; later, his liver failed. (Dr. Spires at 57–58; Dr. Cook at 17–18). Garrett died June 9, 1984 of multiple systems organ failure. (Med.Rec. at 3).

## IV. ALLEGATIONS OF MALPRACTICE

Plaintiffs contend that Garrett's poor progress after surgery and eventual death are the result of malpractice on the part of the physicians and staff of the VA. Plaintiffs allege that Garrett's condition and progress was not properly monitored and treated. Specifically, plaintiffs argue that Garrett was given an excessive amount of intravenous fluids before, during, and following surgery. The plaintiffs' expert testified that in his opinion the excessive fluids resulted in an intravascular volume overload. In the plaintiffs' view of the evidence, this intravascular volume overload resulted in Garrett developing cardiogenic pulmonary edema, a condition in which the heart is unable to pump all of the fluids in the vascular system thus causing fluids to seep from blood vessels into the lungs. The physicians at the VA rejected this diagnosis and treated Garrett for ARDS. It was the opinion of the VA physicians that the fluid in Garrett's lungs was non-cardiogenic in origin. The plaintiffs assert that it was below the standard of care to diagnose and treat Garrett for ARDS. The plaintiffs make the following specific allegations of negligence:

1. Negligence in failing to monitor properly the intravenous fluids administered to Garrett;

2. Malpractice in the misdiagnosis of Garrett's condition;

3. Malpractice in the treatment of that condition;

4. Malpractice in failing to call in a pulmonologist or a cardiologist for consultation;

5. Malpractice in the use of a nurse anesthetist during surgery; and

6. Negligence under the *res ipsa loquiteur* doctrine. The court will address these allegations of malpractice *seriatim*.

### (A) NEGLIGENCE IN FAILING TO MONITOR FLUIDS

#### (1) *Pre-surgery*

Prior to surgery, Garrett's fluid input exceeded his output of urine and gastric fluids suctioned out by the nasal gastric tube. All doctors testified to the importance of maintaining a proper fluid balance in hospital patients. Intravenous fluid is crucial to the maintenance of the heart, circulatory system and kidneys as well as other major organs. For proper care, it is important that the patient not have too much or too little fluid in the vascular system. Dr. Friedman, plaintiff's expert, testified that he believed that Garrett was given too much intravenous fluid before, during, and after surgery, and that this fluid overload created a grave strain on his heart. Dr. Friedman's opinion is that the intravascular volume overload

caused fluid to seep out of Garrett's blood vessels and into his lungs resulting in cardiogenic pulmonary edema. Plaintiffs allege that the VA was negligent in overloading Garrett with intravenous fluids.

This court disagrees. The treating physicians and the experts testifying for the defense were able to justify the fluids administered to Garrett at all times during his stay at the VA. This court finds that the treatment of Garrett did not fall below the standard of care expected of physicians in charge of monitoring their patients' fluid balance.

Garrett was admitted to the hospital after vomiting blood twice. He had also suffered from nosebleeds for nine days prior to admission. (Med.Rec. at 8). A tentative diagnosis of stomach ulcer was made. Garrett was extremely hypotensive as a result of this upper gastrointestinal tract bleeding. Fluids are administered to elevate blood pressure. (Dr. Cook at 16; Dr. Spires at 51–52). According to Dr. Gladney, Garrett was "behind" in his fluids and was given intravenous fluids preoperatively to replace his lost blood and to elevate his blood pressure. Garrett exhibited hypostatic blood pressure in which blood pressure is higher and the pulse rate slower when laying down and are lower and faster when standing or sitting up. (Testimony of Dr. Gladney). Intravenous fluids were necessary to stabilize Garrett's blood pressure and pulse. *Id.*

A normal person carries approximately 6,000 cc's (6 liters) of fluid in the intravascular system. However, when judging whether a sick patient—such as Mr. Garrett—is receiving adequate fluid, it must be remembered that the standard for what is "normal" for healthy people no longer applies. (Dr. Deitch at 14). What is "normal" for a sick patient has to be judged by the physiologic results obtained: good pulse, stable blood pressure, adequate urine output and other vital signs. While 4,000 cc's of intravenous intake may be excessive for a healthy individual, it may be physiologically normal for someone who has been bleeding in the upper gastrointestinal tract. It must also be remembered

that fluid input and output cannot be precisely equated. (Dr. Spires at 50). There is always insensible—that is, immeasurable—loss of fluids through the lungs by breathing and through the skin by sweating. (Testimony of Dr. McDonald). This insensible loss can reach 1,500 cc's per day. *Id.*

From the results obtained, it is clear that Garrett was not given an excessive amount of fluids prior to surgery. The treating physicians were able to maintain an adequate blood pressure and pulse rate as well as good urine production. The success of the preoperative fluid management is seen in the fact that Garrett tolerated his nine hour emergency surgery well with good pulse, good blood pressure and good urine output. (Dr. Cook at 49).

(2) *Intra-surgery*

During surgery, Garrett received approximately 13,000 cc's (13 liters) of intravenous fluids. At the same time, he lost a little less than 4,000 cc's in blood loss and urine output. Thus, he had a positive fluid balance of over 9,000 cc's (9 liters) during surgery. Dr. Friedman, plaintiffs' expert, testified that this was an excessive amount of fluid and that this overload was the precipitating cause of Garrett's near respiratory arrest approximately 40 hours after surgery. The treating physicians and the defense experts all disagreed with Dr. Friedman and testified that Garrett needed this large amount of fluid during surgery.

This court rejects Dr. Friedman's opinion. Dr. Friedman is board certified in internal medicine and pulmonology. He has no expertise in surgery and did not, in any way, demonstrate the scope and depth of surgical knowledge possessed by the treating physicians and defense experts. The VA doctors, backed by independent expert opinion, were able to justify all 13 liters of fluid administered to Garrett during his nine-hour surgery. This court is satisfied that the VA and its staff properly monitored intra-surgical fluids given to Garrett.

Two concepts must be kept in mind in assessing the administration of intra-surgi-

**1156**

cal fluids. First, during surgery, one must abandon any notion of how much fluid a "normal" person needs. As Dr. Deitch explained: "The best way of assessing whether somebody had adequate blood volume is by the vital signs, by the person's sensorium, by physical exam and and by urine output. And that is the way we screen people.... Normal for trauma is not normal for someone who is not traumatized. So ... you need to give the person what they need for their injury, not what is normal." (Deposition at 14). Second, people need copious amounts of fluid during major surgery. This was not always known or practiced in surgery. However, Dr. Deitch explained "in any standard textbook of surgery, in the perioperative or post-operative period if one reads about fluid balance it's clear. And I would think any basic textbook in surgery would contain information about the intraoperative fluid losses how extensive they can be.... [I]t took a lot of time for people to realize how much salt water one has to give to get people to survive major injuries. The major advance that was made during the Korean and Vietnamese Wars is the recognition that one has to give enough salt water to stablize the heart and the blood system, in spite of the fact that frequently these people swell up and their total body water becomes grossly overloaded. But the water is not inside the blood vessels. It is outside. And the water out there is not effective. You need to have the water inside the blood vessels for it to be effective. When that concept was realized, that you cannot judge fluid levels by whether the person has a swollen leg or has edema, then we began to save more and more people." (Deposition at 13).

There are many ways that a patient loses fluid during surgery. The first is blood loss. (Dr. Deitch at 9; Dr. McDonald). The second is through weeping or evaporation. This process was described by Dr. Deitch in his deposition as follows: "[F]luid can be lost ... as weeping from the surface of the bowel if the intestines are exposed to the outside of the operation. The skin serves to sort of put a lid on a bowl of water and once the lid is taken off the water evaporates. The surface area of the intestines or the peritoneal contents is very large. In fact, the surface area of the bowel itself if you were to lay it out as a mat would be a square meter ... and because of that it is possible to lose a lot of fluid from evaporation." (Deposition at 9-10). The abdominal part of Garrett's surgery lasted approximately four to four and a half hours. It was estimated by numerous defense doctors that Garrett would lose approximately 500 to a 1,000 cc's per hour during the abdominal portion of his surgery and that approximately 4,000 cc's of fluid were necessary to replace this loss. (Dr. Deitch at 9, Dr. Spires at 47; testimony of Drs. McDonald and Gladney). The third way in which fluid is lost during surgery is through swelling of the tissues. This process was described by Dr. Deitch as follows: "[W]henever one operates one has to go in and dissect out tissue, raise things, move things around and that causes the tissue in that area to swell. It is not very different if someone sprained their ankle and you get swelling in the ankle which is just fluid that is trapped there. So the swelling within the intestinal contents themselves, outside of evaporation, can be a large amount of fluid and that can represent up to a couple of liters or even three liters, depending on the nature of the dissection and the extent of the dissection." (Deposition at 10). The fourth way in which fluid is lost is through swelling in the leg which is caused by the fact that Garrett had lost circulation in his leg for several hours due to a thrombosis of the femoral artery. Dr. Deitch explained how Garrett would lose several liters of fluid due to the four hour surgical procedure on his leg:

Then the second operation at which time the surgeons went and relieved the obstruction in the artery going to the leg, that operation would allow blood to flow to the leg. Now, although, there is minimal evaporation and even minimal dissection just to get the artery out, one of the things that happens to an extremity when it is deprived of blood is that it has to use energy in a different way. Instead of using oxygen as an energy

source it uses stored protein and stored glucose. And what it goes to is non-oxygen mediated metabolism. So it is sort of like the runner who runs and is running on his stores rather than on the amount of oxygen he can breathe. When these are exhausted the tissues become oxygen starved. And the net result of all this is that the products that are made have a low pH. They are like an acid. That local tissue acid can cause the membranes that surround cells to become leaking. And when flow is restored it is not unusual for that leg to swell. It swells tremendously and holds fluid.

\*     \*     \*     \*     \*     \*

What I'm suggesting is that when the blood supply to an extremity is impaired, the way that tissue has to survive is by using different fuels as energy. The products of those fuels have a side effect of making that leg swell. And the amount of fluid that can be sequestered, stored or trapped in that leg can be in the order of several liters.

(Deposition at 11–12). Fifth, extra fluids needed to be administered during and after the operation to compensate for the natural hormonal changes which occur after significant stress, such as surgery. This process was described by Dr. Spires: "Anytime you stress somebody . . . if you operate on them, you have the certain compensatory mechanisms that kind of come into being that most people who don't treat a lot of it are unaware of. But you release certain endocrine substances . . . [which] just kind of back up your blood pressure and increase your pulse. But certain of them— the anti-diuretic hormone— . . . makes patients hold onto fluid, and that is the secreted as are such things as glucose and what we call mineralocorticoids from the adrenal glands, which make you retain fluid. And it is not uncommon, you know, for patients who have a major operation . . . [to] hang onto a lot of fluid. Like the people who go on cardiopulmonary bypass, they may gain ten pounds in a three-hour operation or something like that, all of which is fluid, because these things make you hang onto

fluids." (Deposition at 48–49). The sixth reason why Garrett needed a great deal of fluid during his surgery was that he was not in perfect balance before his operation. He had begun bleeding again from his stomach ulcer, had low blood pressure, and a quick pulse. The doctors needed to compensate for the pre-surgical bleeding by giving Garrett additional fluids during his surgery. (Dr. Cook at 48; testimony of Dr. Gladney). Finally, Garrett needed fluid during his surgery to flush out the arteriogram dye—administered just hours prior to surgery—which can contribute to renal failure unless it is flushed out of the system. (Dr. Spires at 47; testimony of Dr. Gladney).

Dr. Friedman testified that in his opinion, intraoperative loss of fluids would be minimal. This opinion is simply not credible. Dr. Friedman's opinion simply cannot prevail against that of doctors of greater expertise, such as Dr. McDonald, chief of surgery and chairman of the Department of Surgery at the LSU School of Medicine. Nor does Dr. Friedman's opinion fair any better against that of Dr. Deitch who is one of less than two hundred and fifty physicians certified by the American Board of Surgery as having special competence in the care of critically ill patients. As Dr. McDonald testified at trial, 12,000 to 14,000 cc's of fluid administered during surgery could be explained straight out of a textbook. Dr. Deitch concluded that Garrett was given an an appropriate amount of fluid during his surgery: "I think that it would not be unusual for someone who has had prolonged period of inadequate blood flow to the leg, who has the stress of GI bleeding and requiring a lot of blood transfusions and a big-time abdominal operation in which a lot of fluid is lost directly and indirectly through the wound, it would not be unusual. Now, the circumstances required many liters of fluid and the amount of fluid that was given here, thirteen liters, would not be very unusual in that situation." (Deposition at 12). Given the good blood pressure, pulse and urine output during surgery, the court concludes with Dr. Spires that the treating surgeons "were pretty close" to being "on the money" as

far as the amount of fluid Garrett needed during his surgery. (Deposition at 49).

### (3) Post-surgery

■ Nor is there evidence that the treating physicians administered too much intravenous fluid to Garrett following surgery. Plaintiffs' counsel, in his questioning, was particularly concerned about the positive fluid balance (more input than output) following Garrett's near respiratory arrest. Again, the fluids administered can be justified. Immediately following the arrest, Garrett "was somewhat hypotensive. His blood pressure was low, he was requiring a good bit of fluid to keep his blood pressure up to physiologic levels...." (Dr. Cook at 16). After Garrett developed lung problems, from aspirating gastric fluids approximately forty hours after surgery, the doctors began to worry about the condition of his kidneys. When the lungs do not recover quickly, the kidneys may begin to fail although the exact reason why this occurs is not known in medicine. (Testimony of Dr. McDonald). In particular, the doctors were concerned about maintaining Garrett's urinary output. If the patient develops oliguric failure—that is he produces little or no urine—the doctors must battle a mortality rate of between 50 to 80 percent. However, if the patient develops non-oliguric kidney failure—that is he produces urine but does not adequately filter nitrogenous waste—the mortality rate drops to 25 percent. (Dr. Spires at 52–54; testimony of Dr. McDonald). To encourage Garrett's kidneys to continue to produce urine, the VA physicians gave him intravenous fluids. This was described by Dr. McDonald as "filling up the tank." Dr. Spires described this procedure as an "extra volume challenge to see if his kidneys would respond to it, which they did not." (Deposition at 53). Thus, on May 17, 1984, Garrett was given lasix, a diuretic drug, in an attempt to increase urine output. (Med. Rec. at 354). The lasix was not effective, and Garrett was put on kidney dialysis.

This kidney failure did create an intravascular volume overload by May 18. (Dr. Deitch at 40). However, this overload was due to the kidney failure and not to an act of malpractice on the part of the VA physicians. Id. They followed an accepted regimen to combat potential kidney failure and they lost the battle. (Dr. Spires at 52–53; Dr. Deitch at 40–41, 48; testimony of Drs. Gladney and McDonald). Mr. Garrett's kidney failure was a manifestation of multiple organ failure syndrome. (Dr. Deitch at 48). There is no good treatment plan for the syndrome which one doctor described as "a litany of deterioration that is not stoppable." (Dr. Deitch at 61–62).

This court finds no malpractice in the monitoring or administration of fluids to Bennie Garrett at the VA. Garrett presented a difficult case to monitor with his various bleeding episodes, two major major surgeries and kidney failure. The VA physicians made an heroic attempt to keep Garrett stable. They succeeded up to the point that his kidneys began to fail. At that point, the doctors were up against very bad odds, and they lost despite their best efforts. The law requires no more. The care afforded to Mr. Garrett at the VA with regard to the monitoring of his intravenous fluid volume was well within the standard of care.

### (B) MALPRACTICE IN DIAGNOSIS

■ Dr. Friedman testified that he believed Garrett's near respiratory arrest on May 14, 1984 was caused by cardiogenic pulmonary edema due to an intravascular volume overload. The VA physicians diagnosed Garrett as suffering from ARDS, although they never discovered the exact etiology (or cause) for the syndrome. In Dr. Friedman's opinion, it was below the standard of care to diagnose ARDS rather than cardiogenic pulmonary edema. This court does not agree.

Special rules apply to allegations of misdiagnosis. As this court noted in Sewell:

> A special body of law has developed for alleged acts of misdiagnosis:
>> As to the diagnostic duties required of a ... physician, an error of diagnosis is not malpractice per se. A physician ... is not obligated to always be correct in making a diagnosis. A diagno-

sis is an act of professional judgment and, in case of a misdiagnosis, malpractice exists only if it results from a failure by a physician ... to exercise the standard of degree of care in diagnosing which would have been exercised by a member of his profession in good standing in his locality, under similar circumstances.

*Tillman* [*v. Lawson* ], 417 So.2d [111] at 114 [(La.App. 3d Cir.1982) ]. *See also Gendusa v. St. Paul Fire & Marine Ins. Co.*, 435 So.2d 479 (La.App. 4th Cir.1983). It must also be remembered that in assessing whether the VA failed to exercise the required degree of skill "must be determined in light of conditions existing and facts known at the time thereof, and not in the light of knowledge gained through subsequent developments." *Tillman*, 417 So.2d at 114 (citing 70 C.J.S. Physicians and Surgeons § 48).

629 F.Supp. at 459. In light of the facts known and the conditions existing at the time, this court finds that the VA physicians were well within the standard of care in diagnosing ARDS rather than cardiogenic pulmonary edema.

ARDS is something of a "catch-all phrase ... for a number of insults to the lung." (Dr. Cook at 54; Dr. Deitch at 35). When a person suffers ARDS, there is an increase in the permeability of the pulmonary capillaries (small blood vessels in the lungs) so that fluid leaks into the lung. (Testimony of Dr. Friedman; Dr. Spires at 56; Dr. Deitch at 33–34). The seepage of fluids from the capillaries damages them and makes them stiff because of protein buildup. (Testimony of Dr. Gladney; Dr. Spires at 61). The patient does not get adequate oxygenation of his blood in the lungs and has to receive extra oxygen and high pressure ventilation in an attempt to increase the volume of air in the stiffened lungs. (Testimony of Dr. Gladney; Dr. Deitch at 39).

A number of conditions may lead to the development of ARDS, including: trauma; shock; exposure to toxic chemicals; aspiration pneumonitis or pneumonia; pancreatis; head injury; infection (sepsis); fracture of a long bone (which causes a piece of fat to break off and lodge in the lung and dissolve into acid); the patient's receiving large amounts of blood transfusions; and smoke poisoning. (Testimony of Dr. Friedman and McDonald; Dr. Spires at 30, 57; Dr. Deitch at 33–34). ARDS is a difficult condition to treat and carries a mortality rate of 30 to 50 percent. (Dr. Spires at 42). Following Garrett's near respiratory arrest, a number of tests were run, and the VA physicians determined that Garrett had developed ARDS rather than cardiogenic pulmonary edema. In the days preceding the arrest, Garrett had sustained several conditions which can cause ARDS to develop: the trauma of major surgery, shock from blood loss, and numerous blood transfusions. Additionally, one of the doctors responding to the "code blue" wrote in Garrett's record that he suctioned out of his lungs a substance which "looked like gastric contents." (Med.Rec. at 22). At that time, X-rays showed "patchy infiltrates" in both of Garrett's lungs. *Id.* at 21–22. His oxygenation (ability to get oxygen into the blood system through the lungs) was noted to be very poor despite ventilation. *Id.*

Based on this information, the doctor on the scene, a first or second year resident, made the tentative diagnosis of aspiration pneumonia or ARDS secondary to aspiration of gastric contents. (Med.Rec. at 22a). A number of tests were run to confirm the diagnosis of ARDS and to rule out fluid in the lungs as a result of heart problems. A Swan-Ganz catheter was inserted, and the Swan-Ganz readings were within the normal range. (Testimony of Drs. Gladney and McDonald; Dr. Deitch at 19; Dr. Spires at 38). The Swan-Ganz measures various cardiac pressures, and when the catheter is "wedged" in the left lung, it registers what is known as the pulmonary artery wedge pressure. Cardiogenic pulmonary edema is not seen in the absence of a high pulmonary artery pressure. (Testimony of Drs. Freidman, Gladney and McDonald; Dr. Deitch at 19). Even plaintiffs' expert admitted the pulmonary artery wedge pressure obtained from Garrett on the night of his arrest and the following

morning was inconsistent with a diagnosis of cardiogenic pulmonary edema. The doctors ordered tests of Garrett's cardiac enzymes, and these tests revealed no abnormalities of heart function. (Testimony of Dr. Gladney). Garrett's cardiogram was also normal. (Testimony of Dr. McDonald). Indeed, one of the treating physicians commented to the Garrett family that Mr. Garrett "had the heart of an 18–year old." The physicians also ruled out sepsis (infection) as a cause of the lung disorder. (Testimony of Dr. Gladney; Dr. Spires at 32–33). On the basis of all the medical evidence available, the VA physicians felt confident that they were not confronted with a cardiogenic problem. This court agrees that these physicians properly ruled out intravascular volume overload resulting in cardiogenic pulmonary edema as the cause of Garrett's respiratory problems.

In cases dealing with allegations of misdiagnosis, a finding of malpractice is usually made only where there is some piece of information which should put the physician on notice that his diagnosis may not be correct. This court in *Sewell* held that malpractice was committed when there were seven physical findings and test results which were inconsistent with the diagnosis made. 629 F.Supp. at 459–60. In *White v. Edison*, 361 So.2d 1292 (1st Cir.) *writs refused* 363 So.2d 915 (La.1978), an obstetrician was found to have committed malpractice when he did not heed complaints of pain, fever, chills and distention of the abdoman following the birth of a

very large infant to a teenage mother. However, in *Tillman v. Lawson*, 417 So.2d 111 (La.App. 3d Cir.1982), no malpractice was found when there were no manifest signs of a dormant abscess which the dentist should have found prior to treating his patient.

This case most closely resembles *Tillman* rather than *Sewell* or *White*. This court finds that there were no manifest signs to put the VA physicians on notice that their diagnosis was wrong. In fact, most of the objective evidence was consistent with the diagnosis of ARDS and inconsistent with a diagnosis of cardiogenic pulmonary edema. First, all tests of cardiac function—Swan-Ganz catheter readings,[2] cardiac enzyme tests, cardiograms and X-rays[3]—were normal. (Dr. Spires at 36–38; Dr. Vickers at 25; testimony of Drs. McDonald and Gladney). The pulmonary artery wedge pressure is the most critical piece of information in differentiating between cardiogenic pulmonary edema and ARDS, and in this case, the pressure readings are consistent with the diagnosis made. (Dr. Deitch at 19). Second, Garrett's lungs were clear, according to the respiratory therapist, two hours before his arrest. This would not be consistent with the progress of pulmonary edema. (Dr. Deitch at 15, 16–17, 20). Third, prior to his arrest, Garrett was secreting thick mucous. This is not consistent with cardiogenic pulmonary edema since with a cardiogenic fluid problem, patients typically cough up copious amounts of thin, frothy, pink, spu-

**2.** Dr. Friedman was concerned by the fact that the VA doctors were unable to obtain accurate Swan-Ganz readings after May 15, 1984. Dr. Gladney testified that the Swan-Ganz pulmonary artery wedge pressure readings are often lost due to the tubes or the patient being moved. This court finds that at the time of the near respiratory arrest, the Swan-Ganz readings were normal and that this was the most significant time period. This court does not question the accuracy of the readings at that time. The Swan-Ganz readings are made from an oscilloscope. The pulmonary artery wedge pressure presents a distinctive wave form which is craggy in appearance as opposed to the smooth appearance of the lung pressure reading. (Testimony of Dr. McDonald). Dr. Gladney was at the hospital the entire night following Mr. Garrett's near arrest, and he stated that the wave forms

were satisfactory. From the diagrams of the various wave forms drawn on the courtroom blackboard, this court is satisfied that the VA physicians obtained accurate Swan-Ganz readings on the night of May 14, 1984.

**3.** Dr. Friedman testified that he believed that he detected an increased heart size on the X-rays taken following Garrett's near respiratory arrest. This testimony was refuted by the radiologist, Dr. Vickers, who detected no significant heart enlargement. (Deposition at 24–26). Dr. Friedman's erroneous conclusion probably stems from the fact that the post-arrest X-rays were made by portable X-ray machines which make the heart appear larger due to the decreased film target distance. (Testimony of Dr. McDonald; Dr. Vickers at 26).

tum. (Testimony of Drs. Gladney and Mc-Donald; Dr. Deitch at 20). Finally, although the secretions were not tested for acidity, the physician on the spot stated that he believed he suctioned gastric contents from Garrett's lungs shortly after his arrest. This is consistent with ARDS which can be caused by the aspiration of gastric contents into the lungs. (Testimony of Drs. Gladney and McDonald; Dr. Deitch at 20; Dr. Cook at 15). The introduction of acidic substances into the lungs causes severe damage and often results in ARDS. Drs. Gladney and Cook believe that of all the possible sources of ARDS in Mr. Garrett, aspiration of gastric contents was the most probable cause. (Dr. Cook at 15).

After several days of testimony and after reading numerous depositions, this court is unable to find any evidence which should have alerted the VA staff that their diagnosis was improper. If anything, the court finds within a reasonable medical certainty that the diagnosis of ARDS was the proper one.

### (C) MALPRACTICE IN TREATMENT

■ The physicians at the VA treated Garrett by ensuring that he had an adequate fluid and oxygen supply, putting him on a ventilator, and applying positive end expiratory pressure (P.E.E.P) and large volumes on the ventilator to aid his stiff lungs. (Testimony of Dr. Gladney; Dr. Deitch at 39). As Dr. Deitch explained, the high pressure is an attempt "to blow open the lungs." (Deposition at 39). Dr. Friedman, the plaintiffs' expert, criticized this approach. He testified that he would have cut back on the amount of fluids Garrett received and given him lasix, a diuretic, in order to lower his fluid levels. Dr. Friedman's approach, of course, is based on his diagnosis of cardiogenic pulmonary edema and not on the diagnosis of ARDS.

This court finds no error in the VA's treatment of Garrett for ARDS and accepts this diagnosis in this case. In particular, the court finds that the treating physicians properly maintained a flow of intravenous fluids to Garrett and did not err in waiting until kidney failure set in before starting to administer lasix. As Dr. Spires explained, it may even have been counter-productive to follow the regiment suggested by Dr. Friedman:

> I don't think, in anybody's mind that people who have these wet lungs on X-ray, if it is not of cardiac origin—if it is due to a capillary leak or increased capillary permeability—that you have to give them sufficient fluids to maintain their intravascular volume—that is, the circulating amount of fluids that the heart pumps around—or they do badly. It has also been shown that drying these people up, giving them lasix and that sort of thing, is of no benefit in that circumstance. It kind of clouds the picture.... If you dry them up and they don't need drying up—if you knock their intravascular volume down and their lungs stay wet, then you have to pour a bunch of fluid right back in them to fill them back up. As I say, managing these particular types of patients is probably the hardest thing anybody has to do, and it takes quite a lot of experience to do it.

(Deposition at 56).

By the 18th or 19th of May, Garrett's kidneys began to fail. At that point, his condition worsened and he began to manifest symptoms of multiple organ system failure. (Dr. Deitch at 42–43, 55). Garrett's liver also began to fail at that time. (Dr. Deitch at 55; Dr. Cook at 17). This made treatment particularly difficult because "there's no good treatment for any one area that doesn't impact on another...." (Dr. Deitch at 43). At this point, Dr. Deitch, a specialist in the care of critically ill patients, stated that "his disease was most likely irreversible and whatever one did was going to be wrong." (Deposition at 55). Dr. Spires, the attending physician at the VA, expressed the frustration of treating multiple organ system failure:

> [H]e kept taking our best punch and laughing at us is kind of what it amounts to. He was checked, and rechecked and double checked and supported with whatever drugs were necessary, whatever mechanical ventilation was necessary, dialysis and that sort of thing, but we

couldn't get it turned around. He may be this one guy in a million who won't tolerate the things that, you know, you expect 99 percent of the guys that walk in the door looking like him to tolerate. But we never could find a major error in his care in kind of rehashing the case. He just whipped us.

(Deposition at 43).

Garrett was not in optimum shape when he entered the hospital. Alcoholism was suspected. (Dr. Cook at 35–36; Dr. Spires at 22–24). Garrett was a smoker and his lungs showed some possible abnormality on his admission X–ray. (Dr. Gladney; Dr. Vickers at 52–53). At least one liver test was abnormal as shown by the admission workup. (Dr. Cook at 35, 42; Dr. Haynie at 38). Liver damage from alcohol abuse may not produce grossly abnormal liver chemistries until only a small amount of the liver is left or until the body is subjected to severe trauma. (Dr. Deitch at 28). The doctors tried unsuccessfully to maintain Garrett's lungs, kidneys and liver. The treatment was within the appropriate standard of care, but they failed. Under these circumstances, there is no negligence.

### (D) PULMONOLOGY/CARDIOLOGY CONSULTATION

Plaintiffs' expert, testified that it was below the accepted standard of care not to call in a pulmonology or cardiology consultation. Dr. Friedman stated that a consultation is desirable because the consultant may be able to offer another view, especially when the patient does not improve. Dr. Friedman's opinion does not, however, take into consideration the standard under Louisiana law for malpractice on the basis of a physician's decision not to obtain consultation. The law on this subject was stated in *Sewell:*

Louisiana jurisprudence has a special rule for allegations of malpractice for failure to call in consultants: "[I]t must be shown that consultation with a specialist would have resulted in different or additional treatment, or that such treatment would have been more beneficial than what was done." *Villetto v. Weilbaecher,* 377 So.2d 132, 135 (La.App. 4th Cir.1979). It is "not necessary to consult a specialist where the problem is within the sphere of the doctor's own training and expertise." *Id.*

629 F.Supp. at 458.

In *Sewell,* the court found that it constituted malpractice not to call in a neurologist and/or expert in infectious disease. The court specifically found in *Sewell* that there was a difference in the examinations performed by the consultants and that there was a reasonable medical probability that a specialist would have made a proper diagnosis. *Id.* Here, the court is not convinced that consultations with a specialist in pulmonology or cardiology would have resulted in different care. Dr. Deitch testified that "the appropriate diagnostic and theraputic modalities were instituted...." (Deposition at 18). Dr. Friedman testified that his diagnosis would have been cardiogenic pulmonary edema. The testimony was uniform that cardiogenic pulmonary edema and ARDS are treated differently. However, this court has already ruled that, more probably than not, Garrett suffered from ARDS, rather than a cardiogenic disease. The VA physician's treatment of ARDS was "very appropriate." (Dr. Deitch at 18; testimony of Dr. McDonald).

■ Dr. Friedman testified that, even assuming ARDS as a result of aspiration of gastic content, he would have instituted steroid treatments in contrast to the treatment used by the VA physicians. Dr. Friedman admitted, however, that the steroid treatment is "controversial." Dr. Gladney testified that he was aware of the use of steroids to treat aspiration-type injury to the lungs and that he had used such treatment. However, Dr. Gladney stated that he had abandoned steroid treatment earlier in his career, since there was no evidence that such treatment was beneficial. This court will not find malpractice in the treating physician's failure to adopt a "controversial" treatment modality which is not commonly accepted in the medical profession. A physician must render care to the degree of knowledge and skill ordinarily

exercised and possessed by members of his medical specialty. The physician need not render perfect care. *Sewell,* 629 F.2d at 455 (*citing Babin v. St. Paul Fire & Marine Insurance Co.,* 385 So.2d 849 (La.App. 1st Cir.1980)). *See also Meyer v. St. Paul–Mercury Indemnity Co.,* 73 So.2d 781 (La. 1954). This court would violate the long-established standard of care for physicians if it held a doctor liable for failing to use experimental and unproven treatment on one of his patients.

■ Additionally, the court finds that the treatment of ARDS falls within the "sphere of the doctor's own training and expertise." *Villetto,* 377 So.2d at 135; *Sewell,* 629 F.Supp. at 458. In fact, surgeons may be better equipped to treat the disease than pulmonologists. Four doctors testified that surgeons treat ARDS much more frequently than pulmonologists or cardiologists. (Testimony of Drs. McDonald and Gladney; Dr. Spires at 34, 40; Dr. Deitch at 36). Dr. Spires commented in his deposition:

> You can't pick up a surgical journal that doesn't have a lot about this ARDS type syndrome, and how to predict who is going into it, the etiologies of it, and the outcomes of it and how to treat it. Basically, surgical intensive care unit people treat a lot more of it than probably most pulmonologists or whatever.... As far as postoperative care and treatment of noncardiogenic pulmonary edema or ARDS, I think probably our third year residents—I mean by the time they spend a little while in that 30-bed ICU over there, they can handle it. So as a general rule, we treat it ourselves.

(Deposition at 34). Dr. Deitch stated that, "One does not go to an internist with problems that one can handle." (Deposition at 36). Dr. Gladney testified that, as chief resident on Garrett's case, he felt that a pulmonologist "had nothing to add." Under *Villetto,* these doctors were not obligated to obtain a consultation on a disorder within their own area of specialization and training.

### (E) USE OF A NURSE ANESTHETIST

■ The plaintiffs' expert testified that it was below the standard of care to use a nurse anesthetist during Garrett's surgery, rather than a physician anesthesiologist. However, the plaintiffs point to no injury caused by the use of the nurse anesthetist. There was not a single piece of evidence which indicated that Garrett's complications were caused by the anesthesia used in during surgery or by any act of the nurse anesthetist.

There can be no malpractice by the physician unless the alleged act of malpractice was the cause of injury. *See* La.R.S. 9:2794(A)(3); *Fanguy v. United States,* 595 F.Supp. 456, 461 (E.D.La.1984). Here, the surgeon's failure to use a physician anesthesiologist during surgery caused no injury. Without proof of a causal connection between the doctor's actions and the injury sustained, the plaintiffs have failed to prove malpractice. Further, there was no negligence on the part of the hospital in the use of a nurse anesthetist. For there to be negligence on the part of the hospital, the hospital's actions must be a cause-in-fact of injury to the plaintiff. *See Belmon v. St. Frances Cabrini Hospital,* 427 So.2d 541, 543 (La.App. 3d Cir.1983). Here, the nurse anesthetist was the cause-in-fact of no proven harm to Mr. Garrett. Under Louisiana law, the standards of the Joint Committee for Accreditation of Hospitals (JCAH) serve as evidence of the medical profession's standard of care. *Sibley v. Board of Supervisors of Louisiana State University,* 490 So.2d 307, 311–12 (La.App. 1st Cir. 1986). The JCAH has accepted the use of a nurse anesthetist, and there was testimony that the VA has met its accreditation requirements at all times. (Dr. McDonald). Accordingly, the court finds no malpractice and no hospital negligence in the use of a nurse anesthetist.

### (F) RES IPSA LOQUITUR

■ Plaintiffs' final argument is that the doctrine of *res ipsa loquitur* should be applied in this case. The court cannot apply this doctrine to the facts of this case since ARDS, kidney failure and multiple

organ system failure can occur in the absence of negligence. (Testimony of Dr. McDonald). *See Ray v. Ameri-Care Hospital*, 400 So.2d 1127 (La.App. 1st Cir. 1981); *McCann v. Baton Rouge General Hospital*, 276 So.2d 259 (La.1973).

## V. CONCLUSION

Having listened to the testimony of family members, an economist, several medical experts, having read depositions of five other medical experts and hundreds of pages of the hospital record of Mr. Garrett, there can be no doubt of the result. Based on totality of the evidence and the controlling law, the cause of the death of Tommie Garrett was not malpractice by his attending physicians or by the VA Medical Center. Though some of the expert medical testimony, particularly that of Dr. Friedman, sought to cast some shadow of doubt, by far the medical evidence, both written and verbal, acquitted the doctors and the hospital completely.

To the family of a man who was never sick, who had never been in a hospital or never missed a day at work, the result of his illness is tragic. For their husband and father to have passed from an apparent state of health to his demise during a thirty-two day sojourn at the VA Medical Center will always be difficult to understand or to accept. The autopsy requested, which was refused by the family, might have aided in determining the exact cause of death. Despite these findings of fact and the application of what the law provides, their lack of understanding will not be changed.

Accordingly, there will be judgment in favor of the defendant, United States of America.

### JUDGMENT

This action came on for trial before the court and the issues having been duly tried and a decision having been duly rendered,

IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff take nothing; that the action be DISMISSED on the merits; and that the defendant, the United States of America, recover of the plaintiff its costs of action.